**CITY OF LITTLE FALLS, Respondent,**

v.

**Edwin George WITUCKI, Petitioner, Appellant.**

**No. 50359.**

Supreme Court of Minnesota.

July 3, 1980.

Bruce C. Douglas and Steven D. Emmings, Minneapolis, for petitioner, appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert J. Phillips and Richard J. May, Little Falls, for respondent.

Linda Ojala, Minn. Civil Liberties Union, Minneapolis, Moore, Costello & Hart and Robert G. Danielsen, St. Paul, for amicus.

Heard before OTIS, ROGOSHESKE, and PETERSON, JJ., and considered and decided by the court en banc.

OTIS, Justice.

On December 11, 1978, a Morrison County Court jury found defendant guilty of disorderly conduct in violation of Little Falls, Minnesota, Ordinances § 10.26. He was fined $500 and sentenced to ninety days in jail, of which eighty days were suspended for one year during which defendant is to be on probation. Sentence was stayed pending completion of his appeals. The conviction was affirmed on appeal to a three-judge panel of the District Court for the Seventh Judicial District. By order dated August 9, 1979, we granted defendant's petition for permission to appeal to this court. We affirm.

At approximately 11:00 p. m. on September 19, 1978, defendant Edwin George Witucki and a few of his friends entered the West Side Bar in Little Falls, Minnesota. Just outside the building defendant found a cat which he carried into the building and placed on the bar. Pursuant to defendant's request, one bartender served the cat some beef jerky and a shotglass of cream and served defendant a drink.

About five minutes later, the other bartender, Paula Erwin, told defendant to take the cat outside. He refused. She told him he was cut-off from being served until the cat was removed. He responded, "I let you slip once too many times, I'm not going to let you slip again." Erwin, for the third time, told defendant to remove the cat. He responded by telling her to "get fucked" (or some similar vulgarity). She responded by saying, "Hey, Butch [defendant], I don't have to take any of your crap." She then turned to return to the other end of the bar, and Witucki called her a "black-haired witch," a "cocksucker," and a "son-of-a-bitch."

When asked at trial about her reaction to the words, Erwin testified, "I didn't care for them very well. It scared me. There was nothing I could do about it. There were no guys around so I thought the best thing for me to do, because I was really mad at the time, was just to walk away from him." She also testified that calling the police or any sort of violent action on her part would not be wise or safe because he might wait for her outside after hours and because he was much larger than she and there were no men around to help her.

Defendant was convicted of disorderly conduct under Little Falls, Minnesota, Ordinances § 10.26 which provides:

It is unlawful for any person, in a public or private place, knowing, or having reasonable grounds to know, that it will, or will tend to, alarm, anger or disturb others or provoke any assault or breach of the peace, to do or permit upon premises owned or controlled by him, the following: . . . (3) Engage in offensive, obscene or abusive language or in boisterous and noisy conduct tending reasonably to arouse alarm, anger or resentment in others.

■ This ordinance is substantially the same as Minn. Stat. § 609.72, subd. 1(3) (1978),[1] which this court held constitutional by construing it to proscribe only "fighting

---

1. Minn. Stat. § 609.72 (1978) provides in part:
    Subdivision 1. Whoever does any of the following in a public or private place, knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor:

    *   *   *   *   *   *

    (3) Engages in offensive, obscene, or abusive language or in boisterous and noisy conduct tending reasonably to arouse alarm, anger, or resentment in others.

words." *In re S.L.J.*, 263 N.W.2d 412, 419 (1978). Absent the saving construction, the statute was constitutionally infirm as overbroad because it proscribed protected speech. Specifically, the statute on its face proscribes words which "merely tend to 'arouse alarm, anger, or resentment in others' rather than words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Id.* at 419, *quoting* first, Minn. Stat. § 609.72 (1972), and second, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 72 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942). Because of the strong similarity in language and purpose between the state statute and the city ordinance, both the county court and the district court properly interpreted the ordinance to be limited to proscribing only fighting words.

The question is, did defendant's words in the circumstances in which they were uttered constitute "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 291 (1971), or did they "tend to incite an immediate breach of the peace," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). *Accord In re S.L.J.*, 263 N.W.2d 412, 419 (Minn.1978).

In *In re S.L.J.* the appellant was a fourteen-year-old girl who yelled "fuck you pigs" at two police officers. 263 N.W.2d at 415. The court noted that although "no ordered society would condone the vulgar language" and although "her words were intended to, and did, arouse resentment in the officers, the constitution requires more before a person can be convicted for mere speech." *Id.* at 419–20. The court held that where the words were spoken in retreat by a small teenage girl who was between fifteen and thirty feet from the two police officers sitting in their squad car, "there was no reasonable likelihood that [the words] would tend to incite an immediate breach of the peace or to provoke violent reaction by an ordinary, reasonable person." *Id.* at 420.

In *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the defendant wore a jacket on which the words "Fuck the Draft" were plainly visible. The words were not directed against the person of any possibly offended person; they were directed against the draft.

The instant case is readily distinguishable from both *In re S.L.J.* and *Cohen v. California*. Unlike the defendant's language in Cohen, Witucki's language was directed at and was intended to be about a person, namely Erwin. The abusive language hurled by defendant at Erwin could readily be found by a jury to be inherently likely to incite violence. Defendant was not, as in *Cohen*, merely expressing a controversial political opinion in a vulgar way, he was directly insulting and intimidating an innocent person.

This case is also quite different from *In re S.L.J.* insofar as Erwin was physically much smaller than defendant; Erwin was essentially a captive audience—she had to tend the bar; and the events surrounding the utterance are more intimidating and more likely to induce a violent response than in *In re S.L.J.*

This case is not one of simply vulgar language floating about the bar atmosphere. Nor is it one of merely insulting language. As we noted in *In re S.L.J.*, 263 N.W.2d 412, 416 (Minn.1978) (footnote omitted):

The fact that the words used by appellant are vulgar, offensive, and insulting, and that their use is condemned by an overwhelming majority of citizens does not make them punishable under the criminal statutes of this state unless they fall outside the protection afforded to speech by the First Amendment.

The reasons for such tolerance were explained in *Cohen v. California*, as follows:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours.

\* \* \* \* \* \*

To many the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. * * * That the air may at times seem filled with verbal cacophony is * * * not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. That is why "[w]holly neutral futilities * * * come under the protection of free speech as fully as do Keats' poems or donne's sermons," * * and why "so long as the means are peaceful, the communication need not meet standards of acceptability."

403 U.S. 15, 24–25, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284, 293–94 (1971).

Defendant's speech in this case is not a "trifling and annoying instance of individual distasteful abuse of a privilege." He addressed such abusive, vulgar, insulting and obscene language toward the bartender that his language was properly found to be within the fighting words category of unprotected speech. The fact that the addressee and object of the fighting words exercised responsible and mature forebearance in not retaliating cannot be relied upon by defendant to escape responsibility for his own actions. A defendant can be convicted for disorderly conduct based on the utterance of fighting words without the prosecution having to prove that violence actually resulted. The focus is properly on the nature of the words and the circumstances in which they were spoken rather than on the actual response. The actual response of the addressee or object of the words is relevant, but not determinative, of the issue of whether the utterances meet the fighting words test.

Affirmed.