**In the Matter of the WELFARE OF M.A.H. and J.L.W.**

Nos. C0–97–668, C8–97–756.

Court of Appeals of Minnesota.

Dec. 30, 1997.

Fred Friedman, Chief Public Defender, Daniel K. Lew, Assistant Public Defender, Duluth, for Appellant M.A.H.

Nathaniel Stumme, Indian Legal Assistance Program, Duluth, for Appellant J.L.W.

Hubert H. Humphrey III, Attorney General, St. Paul, for Respondent.

Alan L. Mitchell, St. Louis County Attorney, Melanie S. Ford, Assistant County Attorney, Duluth, for Respondent.

Considered and decided by LANSING, P.J., and DAVIES, and WILLIS, JJ.

## OPINION

WILLIS, Judge.

Two juveniles appeal their delinquency adjudications for disorderly conduct arising from shouting profanities at police officers. We find their speech protected under the First Amendment and therefore reverse.

### FACTS

At approximately 9:00 p.m. on December 5, 1996, Duluth police officers Steven Peterson and James Hansen, driving separate squad cars, responded to a call regarding a fight between juveniles with approximately

30 other children watching. Peterson arrived at the scene and was told the fight had broken up at the sound of sirens. Peterson noticed a group of about 20 juveniles, ranging from teenagers to children as young as six, headed west, some of them walking in or across the street and forcing cars to go around them. The group stopped, whereupon Peterson and Hansen approached and told them to leave the area. Some of the juveniles left; the majority remained in the area, but some moved to the side of the street.

From inside his squad car, Hansen again asked the remaining juveniles to leave. At this point, 17–year–old J.L.W., who was standing on the boulevard between the sidewalk and the street approximately eight feet from Hansen's squad car, shouted, "We can f* * *ing be out here if we want to be!" Hansen got out of his car, admonished J.L.W. for his language, and again told him to leave the area. According to the arrest report, J.L.W. responded, "What the f* * * are you gonna do about it? We can be here if we f* * *in' want to!" Hansen arrested J.L.W. for disorderly conduct and placed him in handcuffs in the rear of the squad car.

More juveniles left after J.L.W.'s arrest, but approximately eight to ten remained, including some of the young children. A third officer arrived on the scene, and Peterson testified that other passing squad cars were visible. At this point, from a distance of 10 to 15 feet from the squad cars, 15–year–old M.A.H. yelled, "This is bulls* * *! This whole thing is f* * *ed up! We can do anything we f* * *in' want to do!" Hansen and Peterson got out of their cars, arrested M.A.H. for disorderly conduct, handcuffed him and placed him in Peterson's squad car, at which point the other children dispersed.

At the consolidated juvenile court hearing, Peterson testified that he was not sure whether M.A.H.'s comments were directed at him or "if it was as a show for the other kids in the area." Hansen testified that M.A.H. was facing the squad cars and that he assumed the comments were directed at the police. There was no testimony with regard to where J.L.W.'s shouts were directed.

Peterson and Hansen both said on cross-examination that they were never tempted to retaliate or provoked to violence and that they never felt the officers were losing control of the situation, although Hansen added that they "didn't want to get to that point either." Hansen testified that he did not feel that his physical safety was threatened. Peterson testified that the other children were not threatening or throwing things, and both officers said they were armed. Asked whether he felt M.A.H.'s statement could provoke retaliatory violence or a riot, Hansen answered,

> [I]t's really hard to say what would happen at that point, you know. * * * [T]hat type of behavior or—or conduct in front of a group of kids—other kids in the area wasn't appropriate and I didn't know how they would react to that.

The court found both J.L.W. and M.A.H. guilty of disorderly conduct, reasoning:

> [A]lthough there is a First Amendment constitutional argument here, the fact that [J.L.W.'s] comments were made in a loud and angry voice * * * means that they were not only addressed to the officers; clearly the other 18 kids, or however many there were at that point, heard them. And the Court finds, as a result, that there was an attempt to arouse alarm or a breach of the peace because these kids had already been told to move along.

> *     *     *     *     *     *

> Respondent [J.L.W.] at that time had been placed under arrest based on his words and the fact that they would arouse alarm, not necessarily in the officer, because he clearly says that he wasn't worried about his physical safety or that there was going to be an immediate riot, but he didn't know what the other kids were going to do as a result of [J.L.W.'s] words.

> [M.A.H.] then decides to speak up and does use * * * inappropriate language also with the officer * * *. [M.A.H.] used a loud, belligerent voice, profane, abusive * * * words. Common sense tells me that it is not only to the officer but to the crowd. * * * I'm finding Respondent [M.A.H.] guilty of disorderly conduct because although people had been told to leave, he chose to use these words not only

to an officer but to the general crowd that was there and that it would tend to reasonably arouse others to a possible breach of the peace.

Both boys appeal the adjudications of delinquency on First Amendment grounds, and we reverse.

## ISSUES

1. Did the district court err in holding that J.L.W.'s and M.A.H.'s actions supported a disorderly conduct adjudication consistent with the First Amendment?

2. Is the evidence sufficient to adjudicate J.L.W. and M.A.H. delinquent for disorderly conduct independent of their profane language?

## ANALYSIS

### First Amendment Standards

M.A.H. and J.L.W. were adjudicated delinquent for disorderly conduct, which is defined as follows:

Whoever does any of the following in a public or private place * * *, knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace * * *:

\*    \*    \*    \*    \*    \*

(3) Engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn.Stat. § 609.72, subd. 1(3) (1996). The supreme court has narrowed the reach of the disorderly conduct statute by stating that a prohibition on language arousing "alarm, anger or resentment" is overbroad and vague. *In re Welfare of S.L.J.*, 263 N.W.2d 412, 418–19 (Minn.1978). The court has instead construed the statute to prohibit only "fighting words" as that term has been defined by the United States Supreme Court, explaining:

The real test is whether, under the facts and circumstances of this case, appellant's mere utterance of these vulgar, offensive, insulting words would tend to incite an immediate breach of the peace, [is] inher-

ently likely to provoke violent reaction, or [would] have an immediate tendency to provoke retaliatory violence or tumultuous conduct by those to whom such words are addressed.

*Id.* at 419 (citations and internal quotes omitted). The court in *S.L.J.* reversed the adjudication of delinquency of a 14–year–old girl who, while walking away from a squad car, turned and said "F\* \* \* you, pigs," from 15 to 30 feet away, reasoning that

there was no reasonable likelihood that [S.L.J.'s words] would tend to incite an immediate breach of the peace or to provoke violent reaction by an ordinary, reasonable person.

*Id.* at 420.

The standard articulated in *S.L.J.* actually incorporates two distinct lines of United States Supreme Court case law. The *S.L.J.* opinion defines "fighting words" in terms of whether a mere utterance would "tend to incite an immediate breach of the peace." *Id.* at 418 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 132, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1974)). Other Supreme Court decisions, however, state that for an utterance to be considered fighting words, it must be an insult personally directed at an individual. *See, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940) (overturning fighting words conviction for lack of "personal abuse"); *see also Gooding v. Wilson*, 405 U.S. 518, 524, 92 S.Ct. 1103, 1107, 31 L.Ed.2d 408 (1972) (holding that fighting words must "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed"). The separate issue of "intentionally provoking a given group to a hostile reaction," *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971), is analyzed according to whether the language in question is "directed to inciting or producing imminent lawless action and * * * likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). *See Cohen*, 403 U.S. at 20, 91 S.Ct. at 1785–86 (rejecting independent arguments that wearing jacket emblazoned with "F\* \* \* the Draft" constituted fighting

words and/or incitement); *accord, Hess v. Indiana,* 414 U.S. 105, 107–08, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (holding that anti-war demonstrator's announcing, to no particular individual or group, "We'll take the f* * *ing street again," after police had cleared street in question, was neither fighting words nor incitement under applicable precedent).

### Disorderly Conduct Standards

■ "Charges brought under Minn.Stat. § 609.72, subd. 1(3) must be closely scrutinized." *State v. Klimek,* 398 N.W.2d 41, 42 (Minn.App.1986). "To avoid interfering with first amendment rights, this statute should not be used to combat rudeness or for social engineering." *Id.* at 43. But a defendant's words are considered as a "package" in combination with conduct and physical movements, viewed in light of the surrounding circumstances. *Id.; see, e.g., City of Little Falls v. Witucki,* 295 N.W.2d 243, 246 (Minn. 1980). "For a person to be guilty of disorderly conduct the public or some member thereof must be disturbed." *State v. Reynolds,* 243 Minn. 196, 199, 66 N.W.2d 886, 889 (1954).

■ Although the court in *S.L.J.* found that adjudication of delinquency invalid as a matter of law, later cases have treated the question of whether language amounts to fighting words as one of fact. *See, e.g., Witucki,* 295 N.W.2d at 245 (holding that jury could find defendant's language inherently likely to provoke violence under circumstances). We interpret the standard of review applicable to a claim that First Amendment defects render the evidence insufficient to sustain a disorderly conduct adjudication, as here, to be a hybrid: This court will review the evidence in the light most favorable to the state and then determine, as a matter of law, whether the defendant's language under that set of circumstances falls outside the protection of the First Amendment. *Compare S.L.J. with City of Minneapolis v. Lynch,* 392 N.W.2d 700, 704–05 (Minn.App.1986) (concluding that jury could find calling police "motherf* * *ing pigs" amounted to fighting words where words appeared to be inciting surrounding crowd of 50 to 100 people, some of whom carried clubs).

■ Every speech-related disorderly conduct conviction upheld by Minnesota appellate courts since *S.L.J.* has involved either an explicit verbal or physical threat of violence or a situation where the victims were placed in fear of imminent physical harm.[1] *See State v. White,* 292 N.W.2d 16, 17 (Minn. 1980) (defendant, using vulgar language, put up clenched fists and threatened to "knock [police officers] down"); *City of St. Paul v. Mulnix,* 304 Minn. 456, 458, 232 N.W.2d 206, 207 (1975) (defendant screamed that she would wait until bartender got off work and kick her "f* * *ing ass all over town")[2]; *Witucki,* 295 N.W.2d at 245 (large male bar patron, only male in bar, yelled insults at small female bartender); *Klimek,* 398 N.W.2d at 42 (intoxicated defendant appeared at wife's residence in violation of court order, yelled, and shook fist at guardian ad litem, frightening guardian, wife, and children); *Lynch,* 392 N.W.2d at 704–05; *see also State v. Ackerman,* 380 N.W.2d 922, 926 (Minn.App.1986) (defendant's conduct alarmed girlfriend enough to call friends for help, and friends enough to call police, whereupon defendant wrestled with, bit, and spat on officers). The fact that the target of alleged fighting words does not retaliate is relevant to the question of whether conduct meets the First Amendment standard, but is

1. Minnesota courts have assumed that words and actions intended and reasonably expected to place a reasonable person in fear of imminent bodily harm are not protected by the First Amendment. *See, e.g., State v. Schweppe,* 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975) (defining "threat" for purposes of terroristic threats statute as communication that in context would have reasonable tendency to create apprehension that originator will act in accordance with it); *State v. Machholz,* 561 N.W.2d 198, 202 (Minn.App.1997) (upholding harassment statute criminalizing conduct intended and reasonably expected to cause feelings of "personal 'oppress[ion], persecut[ion] and intimidat[ion]'") (quoting Minn.Stat. § 609.749, subd. 1(1) (1996)), *review granted* (Minn. June 11, 1997).

2. *Mulnix* was decided before *S.L.J.* and involved violation of an ordinance that primarily targeted noise, but the *S.L.J.* court wrote that the conduct in *Mulnix* "would have been sufficient to warrant a conviction without the addition of the offensive speech." *S.L.J.,* 263 N.W.2d at 419 n. 6.

not determinative. *Witucki*, 295 N.W.2d at 246 (upholding conviction where victim chose not to retaliate due to fear of much larger defendant). Although police officers expect to deal with abusive behavior on a regular basis, disorderly conduct may be found where officers are "subjected to * * * indignities that go far beyond what any other citizen might reasonably be expected to endure." *Ackerman*, 380 N.W.2d at 926 (quoting *City of St. Paul v. Azzone*, 287 Minn. 136, 141, 177 N.W.2d 559, 562 (1970)). Finally, in all these cases, the defendant's obscene language was "directed at and intended to be about a person," as opposed to "merely expressing a controversial political opinion in a vulgar way." *Witucki*, 295 N.W.2d at 245.

## Application of First Amendment Precedent to Instant Case

■ As noted, the state supreme court in *S.L.J.* substituted for the language of section 609.72, subdivision 1(3), a standard encompassing aspects of United States Supreme Court case law on both fighting words and incitement. Thus, in order to adjudicate either J.L.W. or M.A.H. delinquent consistent with the First Amendment, the district court would have had to find that the boy's comments were (1) personal insults whose utterance under the circumstances would be inherently likely to provoke retaliatory violence by the police at whom the insult was directed or (2) intended to and likely to produce imminent lawless action by the surrounding juveniles. *See S.L.J.*, 263 N.W.2d at 419; *Hess*, 414 U.S. at 107–08, 94 S.Ct. at 328; *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829.

### J.L.W.'s conduct

■ The court's only written finding regarding J.L.W. states that he "used profanity toward the police in an attempt to incite the other youths." The court's oral findings were similar, concluding that "there was an attempt to arouse alarm or a breach of the peace" and that J.L.W.'s words

would arouse alarm, not necessarily in the officer, because he clearly says that he wasn't worried about his physical safety or that there was going to be an immediate riot, but he didn't know what the other kids were going to do as a result of [J.L.W.'s] words.

Under *Brandenburg*, a defendant may only be convicted or adjudicated delinquent for incitement if his words were (1) intended to produce imminent lawless action and (2) likely to produce such action. *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829. Even accepting *arguendo* that the district court could infer J.L.W.'s subjective intent in the absence of direct or indirect testimony addressing the issue, the court needed to find that J.L.W.'s shouts were likely to cause the children to engage in some form of immediate illegal conduct. But the court found only that the police "didn't know what the other kids were going to do." Even if *Brandenburg* could be read to allow the officers' subjective uncertainty to satisfy the second prong of the test, *S.L.J.* clearly requires an objective inquiry. *See S.L.J.*, 263 N.W.2d at 420 (inquiring whether there is a "reasonable likelihood that [the conduct at issue] would tend to incite an immediate breach of the peace or to provoke violent reaction by an ordinary, reasonable person").[3] The court's findings are similarly insufficient to support a conclusion that J.L.W.'s profanities constituted fighting words because, even if J.L.W.'s comments could be construed as a personal insult directed at Hansen, the court made no determination as to the effect of J.L.W.'s words on an ordinary, reasonable police officer.

■ Moreover, even if the court's findings were not deficient, we are satisfied in examining the record that the evidence is insufficient to support a finding of either fighting words or incitement. Neither the police nor the surrounding juveniles reacted violently, and we cannot characterize J.L.W.'s words as "likely" to provoke 20 juveniles, many of them quite young, who had

---

3. We note that *S.L.J.* requires that incitement must be likely to create a "breach of the peace" or a "violent reaction," whereas *Brandenburg* requires only incitement to "lawless action."

Compare *S.L.J.*, 263 N.W.2d at 418, 420 *with Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829. We need not decide here whether those standards are equivalent.

already displayed a tendency to avoid confrontation with the police, into a violent reaction against at least two fully armed officers in squad cars or even to some form of civil disobedience as the state hypothesizes. J.L.W.'s conduct may have been "a show for the other kids," but that is not legally equivalent to "advocacy * * * directed to inciting or producing imminent lawless action and * * * likely to incite or produce such action." *Cf. Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829.

▮ Similarly, J.L.W. did not directly insult the police, or overtly threaten them by word or gesture, as did the defendants in *White* and *Mulnix;* the closest he came was asking Hansen "what the f* * * [he was] going to do about" the group's refusal to leave (a statement that appeared only in the arrest report, not in Hansen's trial testimony). This statement might have provoked a reasonable officer to attempt to remove J.L.W. from the scene, but not to react violently, and therefore cannot constitute fighting words.

Finally, the officers testified that J.L.W.'s comments did not place them in fear of imminent harm, and we find it unlikely that a reasonable officer, armed and with backup, would feel such fear under the circumstances. In *Lynch*, by contrast, the crowd surrounding the officers was much larger (as were its members), some of its members carried clubs, and it was overtly hostile to the officers. *See Lynch*, 392 N.W.2d at 704–05. This case differs from *Lynch* in degree rather than in kind, but neither the degree of confrontation in J.L.W.'s manner nor the degree of reasonable fear generated by the surrounding circumstances rises to anywhere near the level in *Lynch*. We therefore conclude that the district court could not reasonably find an objective likelihood that J.L.W.'s actions would have an immediate tendency to provoke retaliatory violence or tumultuous conduct by either the police or the children and hold that J.L.W.'s conduct is protected under the First Amendment.

**M.A.H.'s conduct**

The record does not include written findings by the court with regard to M.A.H. Its oral findings state that M.A.H.'s comments

(1) were directed at the surrounding children and (2) "would tend to reasonably arouse others to a possible breach of the peace." In appealing a juvenile court finding of fact, the defendant must show that the trier of fact could not have reasonably found as it did. *See In re Welfare of T.M.V.*, 368 N.W.2d 421, 423 (Minn.App.1985). Even assuming that the court's findings could be equated with the *Brandenburg* "imminent lawless action" test, we conclude that M.A.H.'s conduct cannot support an adjudication of delinquency.

▮ Although the court's finding that M.A.H.'s shouts were directed at the surrounding children as well as the officers was based on "common sense" and inconclusive evidence, we accept it as a reasonable inference. By the time M.A.H. made his comments, however, there were only eight to ten children remaining, some of them very young. At least three officers were present in squad cars, with others visibly passing. The juveniles had witnessed the arrest of J.L.W., the only member of their group to have shown any hostility toward the police. Under the circumstances, we find it unreasonable to conclude that M.A.H.'s words were likely to provoke the children to riot or to engage in some sort of sit-down strike to block traffic as the state suggests, or even that he intended to do so.

▮ M.A.H.'s remarks also do not constitute fighting words under applicable precedent. According to the police report, M.A.H. shouted, "This is bulls* * *! This whole thing is f* * *ed up! We can do anything we f* * *in' want to do!" M.A.H.'s words were "not directed against the person of any possibly offended person," but against the circumstances. *Witucki*, 295 N.W.2d at 245. M.A.H. neither directly insulted anyone nor manifested an overt invitation to fight; he "merely express[ed] a controversial political opinion in a vulgar way." *Id.*

**"Noisy and Boisterous" Conduct**

The state argues that the boys' conduct, even not considering the content of their speech, could still support an adjudication of delinquency for disorderly conduct because it was noisy and boisterous. Under Minnesota

law, disorderly conduct includes "boisterous * * * or noisy conduct *or* offensive, obscene or abusive language tending reasonably to arouse alarm, anger or resentment." Minn. Stat. § 609.72, subd. 1(3) (emphasis added). In effect, the state argues on appeal that M.A.H. and J.L.W. violated the statute in two ways, through language and through volume. But at trial, the state did not argue volume as an alternative basis for an adjudication of delinquency and mentioned noisy and boisterous conduct only in the context of purporting to distinguish *S.L.J.* (as a case involving only "language" as opposed to "conduct"). In general, this court will not consider matters not raised before the district court, and we see no compelling need to depart from that principle here. *Roby v. State,* 547 N.W.2d 354, 357 (Minn.1996).

## DECISION

On the record before us, the state has not carried its burden of demonstrating either that M.A.H.'s or J.L.W.'s language rose to the level of "fighting words" or that it was likely to provoke imminent lawless action. The state has waived any argument that the noise of the conduct alone was sufficient to sustain a disorderly conduct adjudication, and we therefore conclude that the record contains insufficient evidence to sustain the adjudications of delinquency.

**Reversed.**