226 P.3d 1038

**In re NICKOLAS S.**

**No. 1 CA–JV 09–0147.**

Court of Appeals of Arizona,
Division 1, Department A.

March 2, 2010.

James J. Haas, Maricopa County Public Defender By Ellen Edge Katz, Deputy Public Defender, Phoenix, Attorneys for Appellant.

Andrew P. Thomas, Maricopa County Attorney By Linda Van Brakel, Deputy County Attorney, Phoenix, Attorneys for Appellee.

**OPINION**

DOWNIE, Judge.

¶ 1 Nickolas S. ("Juvenile") appeals his delinquency adjudication for two counts of abuse of a teacher or school employee in violation of Arizona Revised Statutes ("A.R.S.") section 15–507 (2009). Juvenile frames the issue on appeal as follows:

Did the juvenile court err in finding Arizona may criminalize use of words alone which are alleged to "abuse" a teacher so that uttering phrases such as "bitch," "fucking bitch," "stupid bitch," and "fucking bullshit" at or near a teacher is not constitutionally protected speech.

We hold that, to prosecute pure speech under A.R.S. § 15–507, the State must establish that the speech constituted "fighting words." Because one of the adjudicated counts fell short of this standard, we affirm in part and reverse in part.

**FACTS AND PROCEDURAL HISTORY[1]**

¶ 2 On January 27, 2009, B.B. was monitoring on-campus suspension students in a classroom at Deer Valley High School.[2] She saw Juvenile "texting" on his cell phone and told him to put it away. Juvenile refused. B.B. directed him to bring the phone to her desk, threatening to call security to take the phone. Juvenile responded, "[G]o ahead and call them if they think they can take it away."

¶ 3 B.B. called security and again told Juvenile to hand over the phone. Juvenile refused, and "under his breath he kind of made a, bitch, comment." Although Juvenile was not looking at her, B.B. believed the comment was directed at her because Juvenile was upset about his phone being taken away. Security arrived and removed Juvenile from the classroom.

¶ 4 A second incident occurred two days later. Upon entering the OCR classroom, Juvenile asked B.B. to send him to Room 205, a room for "special needs kids or behavioral kids who are not successful in OCR." B.B. told him to sit down and wait for administrative approval. She explained the administrator whose approval was required was not yet in his office. Ten or fifteen minutes later, Juvenile said, "[T]his is stupid I want to go to 205." Again, B.B. advised him to wait for the administrator. Juvenile began

---

1. We view the facts in a light most favorable to sustaining the juvenile court's adjudication and resolve all inferences against Juvenile. *See State v. Long*, 207 Ariz. 140, 142, ¶ 2, 83 P.3d 618, 620 (App.2004). As a practical matter, the underlying facts of this case are undisputed.

2. The classroom is also referred to as "OCR," for "on-campus reassignment."

"playing" with his cell phone. B.B. told him to put it away. Juvenile responded, "Or what? Are you going to make up something? Are you going to say I said something that I didn't say?" B.B. testified Juvenile was "getting loud and yelling at me."

¶ 5 B.B. tried to calm the situation because "kids on the sweep side[3] are standing up now, the OCR kids are turning around looking at him and looking at me." Juvenile yelled, "This is fucking bull shit," and, "You're a fucking bitch." According to B.B., Juvenile was shouting at her from approximately ten to twelve feet away and "looking right at me in a challenging manner, like, what are you going to do now." B.B. called security. Juvenile started to leave the room, but B.B. told him not to go until security arrived. Juvenile left anyway, yelling, "Fucking bitch," and, "You stupid bitch." B.B. opened the classroom door to see where Juvenile was going, whereupon he shouted, "Get away from me you fucking bitch."

¶ 6 According to B.B., this second incident made her feel "mad," "hurt," and "degraded." In total, Juvenile yelled epithets at her "half a dozen or more" times. However, B.B. was not tempted to physically retaliate against Juvenile during either incident.

¶ 7 Juvenile was initially charged with three counts of violating A.R.S. § 15–507,[4] which provides:

A person who knowingly abuses a teacher or other school employee on school grounds while the teacher or employee is engaged in the performance of his duties is guilty of a class 3 misdemeanor.[5]

¶ 8 Juvenile presented no evidence at the adjudication hearing, but argued his speech was protected by the First Amendment. The juvenile court, after receiving additional briefing on the constitutional issue, rejected the First Amendment defense, adjudicated Juvenile delinquent on both counts, and placed him on summary probation.

**3.** "Sweep" students are those who were tardy and remain in B.B.'s classroom for the class period for which they were late.

**4.** Count 3 alleged a third incident, but it was dismissed without prejudice at the outset of the adjudication hearing.

¶ 9 Juvenile timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1) (2003) and 8–235(A) (2007). Juvenile complied with A.R.S. § 12–1841(A) (Supp.2009) by providing notice of his constitutional challenge to A.R.S. § 15–507 to the appropriate parties, none of whom has asked to be heard.

## DISCUSSION

### 1. Juvenile's Speech Must Be Analyzed Under the First Amendment

¶ 10 The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. First Amendment protections apply to the states. *Lovell v. City of Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Freedom of speech, however, is not absolute. *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). We consider Juvenile's constitutional claims *de novo. In re John M.,* 201 Ariz. 424, 426, ¶ 7, 36 P.3d 772, 774 (App.2001).

¶ 11 At the outset, it is important to recognize that this case involves a criminal prosecution based on pure speech. The prosecutor made this clear at the outset of the adjudication hearing, stating:

[T]he State submits that the evidence will show the juvenile did direct personally reviling language, reaching the level of abuse to the victim, [B.B.], while she was at school, employed in her official duties as a school employee.

There is no allegation Juvenile engaged in conduct that would be actionable under other statutes, such as A.R.S. §§ 13–2904 (2001) (disorderly conduct), –1201 (2001) (endangerment), –1202 (Supp.2009) (threatening or intimidating), –1204(A)(8)(d) (Supp.2009) (aggravated assault of school employee), or –

**5.** B.B.'s exact status is not defined by the record, but Juvenile does not dispute she was "a teacher or other school employee on school grounds" and that she was "engaged in the performance of [her] duties."

2911 (Supp.2009) (interference with or disruption of educational institution).

¶ 12 As the United States Supreme Court has "repeatedly held," pure speech is entitled to "comprehensive" protection under the First Amendment. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *See also Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."). Moreover, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker,* 393 U.S. at 506, 89 S.Ct. 733.

¶ 13 It is also relevant that our review relates only to the criminal charges filed against Juvenile. The record reflects he was also suspended from school for ten days for his verbal outbursts. Reported decisions that address school disciplinary actions against students for their speech are of little relevance here, where we consider a statute that criminalizes conduct by anyone, including juveniles and adults. *See, e.g., Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (upholding student discipline for encouraging illegal drug use at a school-sanctioned event with a banner reading "BONG HiTS 4 Jesus"); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (upholding school discipline of a student for an "offensively lewd and indecent speech" at an assembly).

¶ 14 We disagree with the juvenile court's conclusion that the entirety of Juvenile's speech fell outside First Amendment parameters. "The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within 'narrowly limited classes of speech.'" *Gooding v. Wilson,* 405 U.S. 518, 521–22, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (citing *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). In *Chaplinsky,* the Court discussed the categories of speech the State may prevent and punish, stating:

There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

315 U.S. at 571–72, 62 S.Ct. 766 (citing *Cantwell v. Connecticut,* 310 U.S. 296, 309–10, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

¶ 15 This seemingly broad language from *Chaplinsky* has been oft-quoted, though it has also been accurately described as *dictum.* See William S. Cohen, *A Look Back at Cohen v. California,* 34 UCLA L.Rev. 1595, 1599 (1987); Jeffrey M. Shaman, *The Theory of Low–Value Speech,* 48 SMU L.Rev. 297, 301–03 (1995). Indeed, the Court upheld *Chaplinsky's* conviction only after concluding that his personal epithets (calling an officer a "God damned racketeer" and a "damned Fascist") were "likely to provoke the average person to retaliation." *Chaplinsky,* 315 U.S. at 574, 62 S.Ct. 766.

¶ 16 Subsequent cases have not singled out profanity or verbal abuse as unprotected classes of speech. *See, e.g., Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (overturning conviction for disturbing the peace by wearing a jacket bearing the words "Fuck the Draft" in the corridors of a courthouse; expressions of particularized ideas, even through vulgar and offensive words, are protected); *Gooding,* 405 U.S. at 520, 92 S.Ct. 1103 (holding that Georgia statute punishing spoken words could survive constitutional scrutiny "only if ... it is not susceptible of application to

speech, *although vulgar or offensive*, that is protected by the First and Fourteenth Amendments.") (emphasis added and citations omitted); *Shoemaker v. State*, 343 Ark. 727, 38 S.W.3d 350, 353 (2001) (holding that, under *Chaplinsky*, "any statute punishing or regulating the use of abusive language must be limited to fighting words.").

¶ 17 We thus disagree with the juvenile court's conclusion that none of Juvenile's speech was constitutionally protected because it was "simply [his] expression of his anger and frustration" and "consisted merely of calling the teacher degrading names and trying to create or escalate a confrontation with her." Distaste for the content of Juvenile's speech and its relative lack of substance, though understandable, does not deprive it of First Amendment protection for purposes of criminal liability.

### 2. A.R.S. § 15–507 May be Constitutionally Applied to Pure Speech that Constitutes Fighting Words

¶ 18 Juvenile contends A.R.S. § 15–507 is overbroad and/or vague.[6] "Although [o]verbreadth and vagueness challenges often appear in tandem, they are distinct concepts." *Brown*, 207 Ariz. at 237, ¶ 16, 85 P.3d at 115 (internal quotations and citations omitted). An overbroad statute is one designed to burden or punish activities that are not constitutionally protected, but includes within its scope activities that are protected by the First Amendment. *Id.* (internal quotations and citations omitted). A statute "must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Gooding*, 405 U.S. at 522, 92 S.Ct. 1103. A statute is unconstitutionally vague if it "fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly, or if it allows for

arbitrary and discriminatory enforcement by failing to provide an objective standard for those who are charged with enforcing or applying the law." *Brown*, 207 Ariz. at 237, ¶ 16, 85 P.3d at 115 (internal quotations and citations omitted).

¶ 19 In reviewing challenges to a statutory provision, we are guided by a strong presumption that the statute is constitutional. *Id.* at 236, ¶ 15, 85 P.3d at 114 (citations omitted). This presumption "requires the challenging party to establish beyond a reasonable doubt that the statute violates some provision of the constitution." *Id.* (internal quotations and citations omitted). Any doubts are resolved in favor of upholding the statute. *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 67, 977 P.2d 784, 789 (1999).

¶ 20 Section 15–507 is not, by its terms, limited to fighting words in criminal prosecutions predicated on pure speech. *See, e.g.*, A.R.S. § 13–2904 (defining disorderly conduct, in part, as using "abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person"). We agree with Juvenile that a fair reading of the statute includes within its reach pure speech that is otherwise protected by the First Amendment. Consider, for example, a high school student who, upon learning of a poor grade, angrily lashes out at a teacher, saying: "You are the most incompetent, stupid teacher I have ever had. I hate you and I hate coming to your class because you are an idiot." These statements can be labeled many things, including rude, immature, and abusive. The words themselves, though, are protected by the First Amendment.[7]

¶ 21 The fact that A.R.S. § 15–507 can be read to criminalize protected speech demonstrates that it is overbroad.[8] That

---

**6.** Juvenile has standing to raise his constitutional claims. As we determine *infra*, one of the delinquency charges involved protected speech. *Cf. State v. Brown*, 207 Ariz. 231, 237, ¶ 17, 85 P.3d 109, 115 (App.2004) ("[I]f a defendant's conduct is not constitutionally protected and falls within the statute's legitimate scope, he or she generally does not have standing to challenge the statute

on vagueness or overbreadth grounds.") (citations omitted).

**7.** As in the case at bar, school discipline could be appropriate for such a student.

**8.** Regardless of whether the statute is labeled vague or overbroad, the deficiencies have the same impermissible effect. In extending to pro-

determination, though, does not end our inquiry. Courts have a "duty to save a statute, if possible, by construing it so that it does not violate the constitution." *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 445, 719 P.2d 1058, 1061 (1986) (citing *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 554, 637 P.2d 1053, 1057 (1981)).

¶ 22 We disagree with the State that our decision in *In re Paul M.*, 198 Ariz. 122, 7 P.3d 131 (App.2000), has already limited A.R.S. § 15–507 to fighting words. *Paul M.* did not involve a constitutional claim, and it did not address the First Amendment. Nevertheless, we agree with the State that the statute *can* withstand a First Amendment challenge in prosecutions involving pure speech under A.R.S. § 15–507 by limiting its reach to fighting words.

### 3. Only One of the Delinquency Counts Involved Fighting Words

¶ 23 We next evaluate Juvenile's speech to determine whether it rises to the level of fighting words. Our supreme court has defined fighting words as:

> [T]hose personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction. Such words are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Fighting words must be directed to the person of the hearer. The fighting words doctrine has generally been limited to face-to-face interactions.

*Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 519, 115 P.3d 107, 113 (2005) (internal quotations and citations omitted).

¶ 24 We have previously considered fighting words in the school context. In *In re Louise C.*, 197 Ariz. 84, 3 P.3d 1004 (App. 1999), we found a juvenile's abusive language fell short of that standard. Louise was prosecuted under the disorderly conduct statute for using "abusive or offensive language or gestures to any person in a manner likely to provoke immediate physical retaliation by such person." *Id.* at 86, ¶ 6, 3 P.3d at 1006. Louise yelled at an assistant principal, "Fuck this. I don't have to take this shit.... Fuck you. I don't have to do what you tell me." *Id.* at 85, ¶ 2, 3 P.3d at 1005. We reversed Louise's delinquency adjudication, finding that her language, though offensive, did not constitute fighting words because it was not directed at the principal, and "[it] was not likely to provoke an ordinary citizen to a violent reaction, and it was less likely to provoke such a response from a school official." *Id.* at 86, ¶ 8, 3 P.3d at 1006. *Compare John M.*, 201 Ariz. at 428–29, ¶¶ 19–23, 36 P.3d at 776–77 (upholding disorderly conduct adjudication where juvenile shouted racial epithets constituting fighting words at a specific individual), *with Paul M.*, 198 Ariz. at 124–26, ¶¶ 6–12, 7 P.3d at 133–35 (considering A.R.S. § 15–507 on non-constitutional grounds and reversing a delinquency conviction, despite the juvenile's "brazen impudence and gratuitous vulgarity," because he did not personally "attack," "injure," "disparage," "revile," or "denounce" the teacher's aide), *and In re Julio L.*, 197 Ariz. 1, 2, 4, ¶¶ 3, 13, 3 P.3d 383, 384, 386 (2000) (reversing disorderly conduct delinquency conviction where, in arguing with principal, juvenile said "F— you," and kicked over a chair; the supreme court stated, "we must keep in mind the differences between civil and criminal conduct. Our laws do not make criminals out of ... juveniles just because they act offensively or rudely or lack respect and control.").

¶ 25 Turning to the facts of this case, count one involved Juvenile muttering the word "bitch" once "under his breath." He was not looking at B.B. at the time, though she understandably believed Juvenile was directing the epithet at her. This isolated statement was unquestionably disrespectful and inappropriate. We cannot, however, conclude it was likely to cause an ordinary person to react violently. Thus, Juvenile's

---

tected speech, the statute "necessarily leaves all persons to guess just what the law really means to cover, and fear of a wrong guess inevitably leads people to forego the very rights the Constitution sought to protect above all others." *Barenblatt v. United States*, 360 U.S. 109, 137, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (Black, J., dissenting).

speech on this occasion did not rise to the level of fighting words and could not serve as the sole basis for a delinquency charge under A.R.S. § 15–507.

¶ 26 The January 29, 2009 incident was markedly different. Juvenile not only called B.B. a "bitch" once again, he significantly escalated the level of abuse and hostility. Juvenile shouted, "This is fucking bull shit," and, "You're a fucking bitch" while approximately ten to twelve feet from B.B., looking at her "in a challenging manner." When B.B. was unsuccessful in calming Juvenile and resorted to calling security, Juvenile again shouted, "Fucking bitch," and, "You stupid bitch." His shouted epithets made B.B. angry, and she felt "degraded." The record reflects Juvenile directed his statements at B.B. personally and that the situation was potentially volatile. B.B. testified:

> What made me mad was the other students all looking at me to see what I was going to do. And, everybody, oh my God, did you hear that? So the whole room basically lost control at that point.

¶ 27 Although B.B. was not tempted to retaliate with violence against Juvenile, her subjective reaction is not dispositive. An "ordinary citizen" bombarded with such personal epithets shouted from close range by an increasingly angry and agitated speaker, *see Citizen Publ'g,* 210 Ariz. at 519, ¶ 24, 115 P.3d at 113, could be expected to retaliate in some fashion, especially when that person is unable to "avert her ears" or leave the premises.[9] *Cf. Cohen,* 403 U.S. at 21, 91 S.Ct. 1780 (deeming it significant that bystanders could simply avert their eyes to avoid viewing the profane language on defendant's jacket). *See also In re S.J.N–K,* 647 N.W.2d 707, 711, ¶ 12 (S.D.2002) (holding that "[w]hether the target of such provocation does not, in fact, retaliate is not determinative") (citation omitted); *In re Welfare of M.A.H. and J.L.W.,* 572 N.W.2d 752, 757–58 (Minn.Ct. App.1997) ("The fact that the target of alleged fighting words does not retaliate is

relevant to the question of whether conduct meets the First Amendment standard, but is not determinative.") (citation omitted).

¶ 28 One might assume educators who work with adolescents have a longer fuse in the face of abuse, and we alluded to such an assumption in *Louise C.* 197 Ariz. at 86, ¶ 8, 3 P.3d at 1006. *See also Lewis v. City of New Orleans,* 415 U.S. 130, 132, 135, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (Powell, J., concurring) (holding trained officers may be expected to exercise a "higher degree of restraint" and that a "middle-aged" woman shouting, "[Y]ou God damn m.f. police" did not constitute fighting words). Although courts should consider the listener's status and context, and may take into account his or her subjective reaction in assessing whether speech rises to the level of fighting words, we have no difficulty concluding that a reasonable person in these circumstances might well react violently when confronted with such repeated, angry, and personal epithets. The fact B.B. was outwardly calm and professional in the face of a volatile situation demonstrates her professionalism but does not negate the reality that Juvenile's conduct on the second occasion could be expected to evoke a violent reaction. Moreover, unlike in *Louise C.,* where the juvenile's profane tirade was not directed at the school administrator, Juvenile's words here were directed squarely at B.B.

## CONCLUSION[10]

¶ 29 For the foregoing reasons, we vacate the delinquency adjudication as to count one (the January 27, 2009 incident), but affirm the finding of delinquency as to count two (the January 29, 2009 incident).

CONCURRING: MAURICE PORTLEY, Presiding Judge, and LAWRENCE F. WINTHROP, Judge.

---

9. The record reflects B.B. was the sole adult in the classroom at the time.

10. We do not address the State's contention, contained in a footnote to its answering brief,

that the juvenile court should have precluded Juvenile's constitutional defense as untimely. The State did not file a cross appeal so as to preserve this issue for our review.