(No. 49769.-

THE VILLAGE OF SKOKIE, Appellee, v. NATIONAL SOCIALIST PARTY OF AMERICA *et al.,* Appellants.

*Opinion filed January 27, 1978.*

608

David Goldberger and Barbara O'Toole, of Roger Baldwin Foundation of ACLU, Inc., of Chicago, for appellants.

Harvey Schwartz, Corporation Counsel, of Skokie (Gilbert Gordon, of counsel), for appellee.

PER CURIAM: Plaintiff, the village of Skokie, filed a complaint in the circuit court of Cook County seeking to enjoin defendants, the National Socialist Party of America (the American Nazi Party) and 10 individuals as "officers and members" of the party, from engaging in certain activities while conducting a demonstration within the village. The circuit court issued an order enjoining certain conduct during the planned demonstration. The appellate court modified the injunction order, and, as modified, defendants are enjoined from "[i]ntentionally displaying the swastika on or off their persons, in the course of a demonstration, march, or parade." (51 Ill. App. 3d 279, 295.) We allowed defendants' petition for leave to appeal.

The pleadings and the facts adduced at the hearing are fully set forth in the appellate court opinion, and only those matters necessary to the discussion of the issues will be repeated here. The facts are not disputed.

It is alleged in plaintiff's complaint that the "uniform of the National Socialist Party of America consists of the storm trooper uniform of the German Nazi Party embellished with the Nazi swastika"; that the plaintiff village has a population of about 70,000 persons of which approximately 40,500 persons are of "Jewish religion or Jewish ancestry" and of this latter number 5,000 to 7,000 are survivors of German concentration camps; that the defendant organization is "dedicated to the incitation of racial and religious hatred directed principally against individuals of Jewish faith or ancestry and non-Caucasians"; and that its members "have patterned their conduct, their uniform, their slogan and their tactics along the pattern of the German Nazi Party ***."

Defendants moved to dismiss the complaint. In an affidavit attached to defendants' motion to dismiss, defendant Frank Collin, who testified that he was "party leader," stated that on or about March 20, 1977, he sent officials of the plaintiff village a letter stating that the party members and supporters would hold a peaceable, public assembly in the village on May 1, 1977, to protest the Skokie Park District's requirement that the party procure $350,000 of insurance prior to the party's use of the Skokie public parks for public assemblies. The demonstration was to begin at 3 p.m., last 20 to 30 minutes, and consist of 30 to 50 demonstrators marching in single file, back and forth, in front of the village hall. The marchers were to wear uniforms which include a swastika emblem or armband. They were to carry a party banner containing a swastika emblem and signs containing such statements as "White Free Speech," "Free Speech for the White Man," and "Free Speech for White America." The demonstrators would not distribute handbills, make any derogatory statements directed to any ethnic or religious group, or obstruct traffic. They would cooperate with any reasonable police instructions or requests.

At the hearing on plaintiff's motion for an "emergency injunction" a resident of Skokie testified that he was a survivor of the Nazi holocaust. He further testified that the Jewish community in and around Skokie feels the purpose of the march in the "heart of the Jewish population" is to remind the two million survivors "that we are not through with you" and to show "that the Nazi threat is not over, it can happen again." Another resident of Skokie testified that as the result of defendants' announced intention to march in Skokie, 15 to 18 Jewish organizations, within the village and surrounding area, were called and a counterdemonstration of an estimated 12,000 to 15,000 people was scheduled for the same day. There was opinion evidence that defendants' planned demonstration in Skokie would result in violence.

The circuit court entered an order enjoining defendants from "marching, walking or parading in the uniform of the National Socialist Party of America; marching, walking or parading or otherwise displaying the swastika on or off their person; distributing pamphlets or displaying any materials which incite or promote hatred against persons of Jewish faith or ancestry or hatred against persons of any faith or ancestry, race or religion" within the village of Skokie. The appellate court, as earlier noted, modified the order so that defendants were enjoined only from intentional display of the swastika during the Skokie demonstration.

The appellate court opinion adequately discussed and properly decided those issues arising from the portions of the injunction order which enjoined defendants from marching, walking, or parading, from distributing pamphlets or displaying materials, and from wearing the uniform of the National Socialist Party of America. The only issue remaining before this court is whether the circuit court order enjoining defendants from displaying the swastika violates the first amendment rights of those defendants.

In defining the constitutional rights of the parties who come before this court, we are, of course, bound by the pronouncements of the United States Supreme Court in its interpretation of the United States Constitution. (*Ableman v. Booth* (1859), 62 U.S. (21 How.) 506, 16 L. Ed. 169; *Cooper v. Aaron* (1958), 358 U.S. 1, 3 L. Ed. 2d 1, 78 S. Ct. 1401.) The decisions of that court, particularly *Cohen v. California* (1971), 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780, in our opinion compel us to permit the demonstration as proposed, including display of the swastika.

"It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers" (*Bachellar v. Maryland* (1970), 397 U.S. 564, 567, 25 L. Ed. 2d 570, 574, 90 S. Ct. 1312, 1315), and it is entirely clear that the wearing of distinctive clothing can be symbolic expression of a thought or philosophy. The symbolic expression of thought falls within the free speech clause of the first amendment (*Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733), and the plaintiff village has the heavy burden of justifying the imposition of a prior restraint upon defendants' right to freedom of speech (*Carroll v. President of Princess Anne County* (1968), 393 U.S. 175, 21 L. Ed. 2d 325, 89 S. Ct. 347; *Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 29 L. Ed. 2d 1, 91 S. Ct. 1575).

The village of Skokie seeks to meet this burden by application of the "fighting words" doctrine first enunciated in *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766. That doctrine was designed to permit punishment of extremely hostile personal communication likely to cause immediate physical response, "no words being 'forbidden except such as have a direct tendency to cause acts of violence by the

persons to whom, individually, the remark is addressed.' "
(315 U.S. 568, 573, 86 L. Ed. 1031, 1036, 62 S. Ct. 766,
770.) In *Cohen* the Supreme Court restated the description
of fighting words as "those personally abusive epithets
which, when addressed to the ordinary citizen, are, as a
matter of common knowledge, inherently likely to pro-
voke violent reaction." (403 U.S. 15, 20, 29 L. Ed. 2d
284, 291, 91 S. Ct. 1780, 1785.) Plaintiff urges, and the
appellate court has held, that the exhibition of the Nazi
symbol, the swastika, addresses to ordinary citizens a
message which is tantamount to fighting words. Plaintiff
further asks this court to extend *Chaplinsky,* which upheld
a statute punishing the use of such words, and hold that
the fighting-words doctrine permits a prior restraint on
defendants' symbolic speech. In our judgment we are
precluded from doing so.

In *Cohen,* defendant's conviction stemmed from
wearing a jacket bearing the words "Fuck the Draft" in a
Los Angeles County courthouse corridor. The Supreme
Court for reasons we believe applicable here refused to
find that the jacket inscription constituted fighting words.
That court stated:

> "The constitutional right of free expression is
> powerful medicine in a society as diverse and
> populous as ours. It is designed and intended to
> remove governmental restraints from the arena of
> public discussion, putting the decision as to what
> views shall be voiced largely into the hands of
> each of us, in the hope that use of such freedom
> will ultimately produce a more capable citizenry
> and more perfect polity and in the belief that no
> other approach would comport with the premise
> of individual dignity and choice upon which our
> political system rests. See *Whitney v. California,*
> 274 U.S. 357, 375-377 (1927) (Brandeis, J.,
> concurring).

To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. *** 'so long as the means are peaceful, the communication need not meet standards of acceptability,' *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971).

Against this perception of the constitutional policies involved, we discern certain more particularized considerations that peculiarly call for reversal of this conviction. First, the principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word [emblem]? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word [emblem] being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitu-

tion leaves matters of taste and style so largely to the individual.

\*\*\*

Finally, and in the same vein, we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words [emblems] as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results." 403 U.S. 15, 24-26, 29 L. Ed. 2d 284, 293-94, 91 S. Ct. 1780, 1787-88.

The display of the swastika, as offensive to the principles of a free nation as the memories it recalls may be, is symbolic political speech intended to convey to the public the beliefs of those who display it. It does not, in our opinion, fall within the definition of "fighting words," and that doctrine cannot be used here to overcome the heavy presumption against the constitutional validity of a prior restraint.

Nor can we find that the swastika, while not representing fighting words, is nevertheless so offensive and peace threatening to the public that its display can be enjoined. We do not doubt that the sight of this symbol is abhorrent to the Jewish citizens of Skokie, and that the survivors of the Nazi persecutions, tormented by their recollections, may have strong feelings regarding its display. Yet it is entirely clear that this factor does not justify enjoining defendants' speech. The *Cohen* court spoke to this subject:

"Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon

unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, *e.g., Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e.g., Rowan v. Post Office Dept.*, 397 U.S. 728 (1970), we have at the same time consistently stressed that 'we are often "captives" outside the sanctuary of the home and subject to objectionable speech.' *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." 403 U.S. 15, 21, 29 L. Ed. 2d 284, 291-92, 91 S. Ct. 1780, 1786.

See also *Kunz v. New York* (1951), 340 U.S. 290, 95 L. Ed. 280, 71 S. Ct. 312; *Street v. New York* (1969), 394 U.S. 576, 22 L. Ed. 2d 572, 89 S. Ct. 1354.

Similarly, the Court of Appeals for the Seventh Circuit, in reversing the denial of defendant Collin's application for a permit to speak in Chicago's Marquette Park, noted that courts have consistently refused to ban speech because of the possibility of unlawful conduct by

those opposed to the speaker's philosophy.

"Starting with Terminiello v. City of Chicago, 337 U.S. 1, 69 S. Ct. 894, 93 L. Ed. 1131 (1949), and continuing to Gregory v. City of Chicago, 394 U.S. 111, 89 S. Ct. 946, 22 L. Ed. 134 (1969), it has become patent that a hostile audience is not a basis for restraining otherwise legal First Amendment activity. As with many of the cases cited herein, if the actual behavior is not sufficient to sustain a conviction under a statute, then certainly the anticipation 'of such events cannot sustain the burden necessary to justify a prior restraint." *Collin v. Chicago Park District* (7th Cir. 1972), 460 F.2d 746, 754.

*Rockwell v. Morris* (1961), 12 App. Div. 2d 272, 211 N.Y.S.2d 25, *aff'd mem.* (1961), 10 N.Y.2d 721, 749, 219 N.Y.S.2d 268, 605, *cert. denied* (1961), 368 U.S. 913, 7 L. Ed. 2d 131, 82 S. Ct. 194, also involved an American Nazi leader, George Lincoln Rockwell, who challenged a bar to his use of a New York City park to hold a public demonstration where anti-Semitic speeches would be made. Although approximately 2½ million Jewish New Yorkers were hostile to Rockwell's message, the court ordered that a permit to speak be granted, stating:

"A community need not wait to be subverted by street riots and storm troopers; but, also, it cannot, by its policemen or commissioners, suppress a speaker, in prior restraint, on the basis of news reports, hysteria, or inference that what he did yesterday, he will do today. Thus, too, if the speaker incites others to immediate unlawful action he may be punished—in a proper case, stopped when disorder actually impends; but this is not to be confused with unlawful action from others who seek unlawfully to suppress or punish the speaker.

So, the unpopularity of views, their shocking quality, their obnoxiousness, and even their alarming impact is not enough. Otherwise, the preacher of any strange doctrine could be stopped; the anti-racist himself could be suppressed, if he undertakes to speak in 'restricted' areas; and one who asks that public schools be open indiscriminately to all ethnic groups could be lawfully suppressed, if only he choose to speak where persuasion is needed most." 12 App. Div. 2d 272, 281-82, 211 N.Y.S.2d 25, 35-36.

In summary, as we read the controlling Supreme Court opinions, use of the swastika is a symbolic form of free speech entitled to first amendment protections. Its display on uniforms or banners by those engaged in peaceful demonstrations cannot be totally precluded solely because that display may provoke a violent reaction by those who view it. Particularly is this true where, as here, there has been advance notice by the demonstrators of their plans so that they have become, as the complaint alleges, "common knowledge" and those to whom sight of the swastika banner or uniforms would be offensive are forewarned and need not view them. A speaker who gives prior notice of his message has not compelled a confrontation with those who voluntarily listen.

As to those who happen to be in a position to be involuntarily confronted with the swastika, the following observations from *Erznoznik v. City of Jacksonville* (1975), 422 U.S. 205, 45 L. Ed. 2d 125, 95 S. Ct. 2268, are appropriate:

"The plain, if at all times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, 'we are inescapably captive audiences for many purposes.' *Rowan v. Post Office Dept.*, [397 U.S. 728,] 736. Much that we encounter offends our

esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, absent the narrow circumstances described above [home intrusion or captive audience], the burden normally falls upon the viewer to 'avoid further bombardment of [his] sensibilities simply by averting [his] eyes.' *Cohen v. California* [403 U.S. 15,] 21." 422 U.S. 205, 210-11, 45 L. Ed. 2d 125, 131-32, 95 S. Ct. 2268, 2273.

Thus by placing the burden upon the viewer to avoid further bombardment, the Supreme Court has permitted speakers to justify the initial intrusion into the citizen's sensibilities.

We accordingly, albeit reluctantly, conclude that the display of the swastika cannot be enjoined under the fighting-words exception to free speech, nor can anticipation of a hostile audience justify the prior restraint. Furthermore, *Cohen* and *Erznoznik* direct the citizens of Skokie that it is their burden to avoid the offensive symbol if they can do so without unreasonable inconvenience. Accordingly, we are constrained to reverse that part of the appellate court judgment enjoining the display of the swastika. That judgment is in all other respects affirmed.

*Affirmed in part and*
*reversed in part.*

MR. JUSTICE CLARK, dissenting.