Opinion by JUDGE HARRIS
¶ 1 R.C., a fourteen-year-old middle school student, took a photo of his friend, L.P., and then drew a penis over the photo. He showed the doctored photo to L.P. and some other friends. L.P. reported R.C. to the principal, who called the police. The police charged R.C. with disorderly conduct and, after a bench trial, the court adjudicated R.C. a delinquent.
¶ 2 On appeal, R.C. challenges the sufficiency of the evidence, arguing, primarily, that the prosecution failed to prove that his display of the photograph tended to incite an immediate breach of the peace. We agree and therefore reverse.
I. Background
¶ 3 During class one afternoon, R.C. used his cell phone to take a photo of L.P. Then, using the mobile application Snapchat, he drew a picture of an ejaculating penis next to L.P.'s mouth.[1] R.C. showed the altered photo to L.P. and three other friends. R.C. was "giggling" when he showed the other boys *1107 the photo. One of the other boys laughed too, but L.P. felt "bad." About five minutes later, class ended and the boys went to lunch.
¶ 4 In the cafeteria, a few other students looked at the photo and laughed, which made L.P. feel even worse. Two of L.P.'s friends told R.C. to apologize and R.C. agreed to, but when he approached L.P., L.P. pushed R.C. away. L.P. and his friends reported the incident to the principal later that day.
¶ 5 R.C. was charged with disorderly conduct, and the case proceeded to trial. The court ruled that R.C. knew that his drawing would make L.P. feel humiliated and ashamed and would have tended to incite an immediate breach of the peace, in large part because the drawing implied that L.P. was "homosexual or behaves in that kind of behavior or has some sort of demeanor about that." The court sentenced R.C. to three months of probation, therapy, and eight hours of work crew.
II. Discussion
¶ 6 A person commits disorderly conduct if he or she "intentionally, knowingly, or recklessly: ... [m]akes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace." § 18-9-106(1)(a), C.R.S. 2016.
¶ 7 R.C. contends that the prosecution failed to prove beyond a reasonable doubt every element of the offense of disorderly conduct. According to R.C., his drawing was protected speech because, consistent with the First Amendment, only "fighting words" are prohibited under the statute, and the altered photo did not qualify as fighting words. Even if it did, R.C. says, the prosecution failed to prove that he knew, or recklessly disregarded a substantial risk, that displaying the photo was likely to provoke an immediate, violent response.[2]
*1108 A. Standard of Review
¶ 8 On a challenge to the sufficiency of the evidence, we review the record de novo to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is both "substantial and sufficient" to support the defendant's guilt beyond a reasonable doubt. Dempsey v. People , 117 P.3d 800, 807 (Colo. 2005). In applying this test, "we must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence." People v. Atencio , 140 P.3d 73, 75 (Colo. App. 2005). And we will not disturb the fact finder's determinations of witness credibility and the weight to be given to the evidence. People v. McIntier , 134 P.3d 467, 471 (Colo. App. 2005).
B. Analysis
¶ 9 The United States and Colorado Constitutions prohibit the enactment of laws abridging or impairing freedom of speech. U.S. Const. amend. I ; Colo. Const. art. II, § 10 ; see also NAACP v. Button , 371 U.S. 415, 444-45, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (The "Constitution protects expression ... without regard ... to the truth, popularity, or social utility of the ideas and beliefs which are offered."). Still, the constitutional prohibition is not absolute: courts have upheld the constitutionality of statutes that prohibit obscenity, see Miller v. California , 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ; libel, see N.Y. Times Co. v. Sullivan , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ; incitement, see Brandenburg v. Ohio , 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) ; invasion of substantial privacy interests of the home, see Rowan v. U.S. Post Office Dep't , 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) ; and, as relevant here, "fighting words." Chaplinsky v. New Hampshire , 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
¶ 10 Fighting words are those "which by their very utterance tend to incite others to unlawful conduct or provoke retaliatory actions amounting to a breach of the peace." Hansen v. People , 190 Colo. 457, 461, 548 P.2d 1278, 1281 (1976), superseded by statute , Ch. 227, sec. 1, § 18-9-106(1)(a), 1981 Colo. Sess. Laws 1010, as recognized in People v. Smith , 862 P.2d 939, 942 n.6 (Colo. 1993). To qualify as speech likely to incite a breach of the peace, it is not enough that words, gestures, or displays "stir[ ] the public to anger," "invite dispute," or "create a disturbance"; they must "produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Terminiello v. City of Chicago , 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) ; see also Gooding v. Wilson , 405 U.S. 518, 525, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (stating that "opprobrious" and "abusive" words that convey disgrace and include harsh insulting language are not necessarily fighting words).
¶ 11 Colorado's disorderly conduct statute is narrowly drawn to ban only "fighting words," as that term has been interpreted by our supreme court and the United States Supreme Court. See Hansen , 190 Colo. at 461, 548 P.2d at 1281 (to pass constitutional muster, the disorderly conduct statute may prohibit only "fighting words").
¶ 12 Citing Chaplinsky , the dissent defines fighting words to include words that by their very utterance "inflict injury," and it then appears to endorse R.C.'s conviction on the theory that the photo amounted to bullying that was likely to inflict injury on L.P. But soon after Chaplinsky , the Supreme Court either dropped the "inflict injury" category of fighting words altogether or recited the full definition of fighting words without further reference to any distinction between merely hurtful speech and speech that tends to provoke an immediate breach of the peace. See Purtell v. Mason , 527 F.3d 615, 623 (7th Cir. 2008) (discussing the evolution of the fighting words doctrine). The Supreme Court has *1109 "never held that the government may, consistent with the First Amendment, regulate or punish speech that causes emotional injury but does not have a tendency to provoke an immediate breach of the peace." Id. at 624 ; see Note, The Demise of the Chaplinsky Fighting Words Doctrine: An Argument for its Interment , 106 Harv. L. Rev. 1129, 1129 (1993) ("The jurisprudential history of the Chaplinsky doctrine has led some commentators to conclude that the Court has sub rosa overruled the entire fighting words doctrine, or at least the 'inflict injury' prong."). In any case, the Colorado statute does not prohibit utterances, gestures, or displays that "inflict injury," but only those that "tend[ ] to incite an immediate breach of the peace." § 18-9-106(1)(a).
¶ 13 The question, then, is not, as the dissent suggests, whether L.P. might have suffered reputational injury, or, as a "highly sensitive" middle schooler (as most middle schoolers are), might have become "upset" by the photo, Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204 , 523 F.3d 668, 674 (7th Cir. 2008), but rather whether R.C.'s display of the doctored photo tended to incite an immediate breach of the peace; that is, whether the display was, "as a matter of common knowledge, inherently likely to provoke a violent reaction" from a reasonable person. Coggin v. State , 123 S.W.3d 82, 90 (Tex. App. 2003) (quoting Cohen v. California , 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ).
¶ 14 As a preliminary matter, we must disagree with the dissent's characterization of the Snapchat photo as a "sexually explicit image of a minor" engaging in "fellatio." Under federal law, a "sexually explicit" image of fellatio is one that depicts "graphic ... oral-genital" contact "between persons of the same or opposite sex." 18 U.S.C. § 2256 (2)(B)(i) (2012). The Snapchat photo was not introduced at trial and is not part of the record on appeal (because it was automatically deleted after some number of hours), but there was no testimony (or argument) that the photo depicted graphic oral-genital contact between two people. Instead, the evidence established that R.C. used the Snapchat app to hand draw a penis over an existing photo. Saying that a hand-drawn, cartoon-like picture of a penis superimposed on a photo is a "sexually explicit image" of a minor engaging in fellatio is like saying that the picture contained in footnote 1 (Figure 2) is a graphic depiction of rhinoplasty.
¶ 15 So we turn to the issue of whether the cartoon drawing of a penis on a photo is likely to incite a reasonable person-or even a reasonable middle schooler[3] -to immediate physical violence.
¶ 16 In this day and age, the notion that any set of words-much less a crayon-type drawing of a penis on a photograph-is "so provocative that [it] can reasonably be expected to lead an average [person] to immediately respond with physical violence is highly problematic." State v. Tracy , 130 A.3d 196, 209 (Vt. 2015). The cases cited at the outset of the dissenting opinion make this very point: words alone, no matter how offensive or cruel, cannot justify violence. And, as the Vermont Supreme Court has pointed out, that is a principle people ordinarily learn as children:
In a society in which children are admonished to 'use your words' rather than respond to anger and frustration by physically lashing out-and are taught the refrain, 'Sticks and stones will break my bones, but words will never hurt me,' as an appropriate *1110 response to taunts-the class of insults for which violence is a reasonably expected response, if it exists at all, is necessarily exceedingly narrow.
Id. at 209-10.
¶ 17 That the category of "fighting words" has been shrinking is obvious-the Supreme Court has overturned every single fighting words conviction it has reviewed since Chaplinsky was decided in 1942. Id. at 205 ; see also Burton Caine, The Trouble With "Fighting Words": Chaplinsky v. New Hampshire is a Threat to FirstAmendment Values and Should be Overruled , 88 Marq. L. Rev. 441, 536 (2004).
¶ 18 The district court concluded that the drawing constituted fighting words because its display would tend to make the subject of the photo feel humiliated and ashamed. But speech that embarrasses or disgraces another is insufficient to qualify as fighting words. Even vulgar and insulting speech that is likely to arouse animosity or inflame anger, or even to provoke a forceful response from the other person, is not prohibited. "The fact that speech arouses some people to anger is simply not enough to amount to fighting words in the constitutional sense." Cannon v. City & Cty. of Denver , 998 F.2d 867, 873 (10th Cir. 1993). Rather, fighting words are limited to "speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline." Tracy , 130 A.3d at 210.
¶ 19 Our position would not change even if we believed, as the district court apparently did, that the photo might have implied that L.P. was gay. Indeed, this assumption was the basis of the court's ruling: if R.C. had drawn a mustache or a big nose on the photo, the court explained, it would not have amounted to disorderly conduct, even, presumably, if the big-nose photo had hurt L.P.'s feelings. But R.C. drew a picture that was "sexual [in] nature" and went "directly to [L.P.'s] gender being male," which made the photograph much more offensive, according to the court; so much so that, upon seeing the photo, L.P. would reasonably have been incited to violence.
¶ 20 We discern two problems with the court's reasoning. First, there was, in fact, no evidence that R.C. intended to imply that L.P. was gay or that L.P. perceived the photograph as any sort of commentary on his sexual orientation.
¶ 21 Second, even if we assume such commentary, we cannot conclude that, as a matter of law, the mere insinuation that a person is gay amounts to "fighting words." We disagree with the district court, and the dissent, that the suggestion of homosexuality or homosexual conduct is so shameful and humiliating that it should be expected to provoke a violent reaction from an ordinary person.
¶ 22 In any event, the words-or the display of the Snapchat photo in this case-cannot be evaluated in a vacuum; context is critical. "[A] defendant's words are considered as a 'package' in combination with conduct and physical movements, viewed in light of the surrounding circumstances." In re Welfare of M.A.H. , 572 N.W.2d 752, 757 (Minn. Ct. App. 1997) ; see also People in Interest of K.W. , 2012 COA 151, ¶ 30, 317 P.3d 1237 ("The context or circumstances in which the language is used must also be considered."). Thus, whether speech or a display constitutes fighting words must be determined on a case-by-case basis, considering all of the particular facts and circumstances. Conkle v. State , 677 So.2d 1211, 1215 (Ala. Crim. App. 1995) ; see also Texas v. Johnson , 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("[W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression....").
¶ 23 With this standard in mind, we have been unable to uncover any authority to support the proposition that a mere statement that someone is a homosexual or engages in homosexual conduct (assuming the meaning ascribed to the photo by the district court and the dissent) constitutes fighting words. See also K.W. , ¶ 34 (affirming juvenile's conviction for disorderly conduct where evidence showed more than juvenile's single utterance of offensive words; rather, juvenile was threatening to harm other students, "she was hostile"-requiring security guard to intervene, *1111 and she "repeatedly yelled the base obscenities at the security officer in an aggressive manner"); cf . Gilles v. State , 531 N.E.2d 220, 221-23 (Ind. Ct. App. 1988) (holding that the defendant's loud and boisterous shouting at large group of people that they were "fuckers," "sinners," "whores," "queers," "AIDS people," and "scum of the earth" who were going to hell, which occurred at a festival where alcohol was served and continued despite police officers' repeated requests for the defendant to stop, constituted disorderly conduct). We note, however, that the display of swastikas during a march through a community inhabited by Holocaust survivors-a display that many might consider more likely to incite a violent response than a hand-drawn picture of a penis-has been held not to amount to "fighting words." Village of Skokie v. Nat'l Socialist Party of Am. , 69 Ill.2d 605, 14 Ill.Dec. 890, 373 N.E.2d 21, 25-26 (1978). Nor could the City of St. Paul use its disorderly conduct statute to ban a defendant's conduct of burning a cross on a black family's lawn. See R.A.V. v. City of St. Paul , 505 U.S. 377, 391-92, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).
¶ 24 Here, the circumstances surrounding R.C.'s display of the photograph do not support the finding that the display was likely to lead to immediate violence. To begin, R.C. and L.P. were friends. R.C.'s display was not accompanied by any hostile, aggressive, or threatening language or conduct. When R.C. showed L.P. and the other boys the altered photo, they were in a classroom where, presumably, a teacher was nearby and available to intervene or mediate if tempers flared or feelings were hurt. There was no evidence that R.C.'s display of the photo caused any sort of commotion or that it was even noticed by other children or the teacher. And, the display did not, in fact, arouse an immediate violent response from L.P.; instead, L.P.'s immediate reaction was to shrug off the incident, by pretending to laugh along with his friends. See M.A.H., 572 N.W.2d at 757-58 (fact that the target of alleged fighting words does not retaliate is relevant to question of whether speech constitutes fighting words, but is not determinative); see also Purtell , 527 F.3d at 625 (noting that display was present for weeks without causing any disruption and emphasizing that, to qualify as fighting words, the speech must "have a tendency to provoke an average person to commit an immediate breach of the peace").
¶ 25 The dissent misunderstands our position, insisting that we have concluded that case law does "not support treating references to sexual orientation as fighting words." Our position, though, is simply that, under the circumstances presented in this case, R.C.'s display of the photo did not amount to fighting words because it was not likely to incite an immediate breach of the peace. We certainly have not foreclosed the possibility that, under other circumstances, references to a person's sexual orientation might indeed rise to the level of fighting words.
¶ 26 Adopting the district court's reasoning, and undaunted by the absence of any aggravating circumstances, the People argue for the first time on appeal that the photo was akin to R.C. calling L.P. a "cocksucker," a term that by its mere utterance qualifies as fighting words. We are not persuaded.
¶ 27 The requirement that we consider the language in context means that we must also evaluate its harshness in the current climate: "what may have constituted 'classical fighting words' in 1942 might comprise nothing more than an innocuous expression" today. Svedberg v. Stamness , 525 N.W.2d 678, 683 (N.D. 1994). Indeed, in Chaplinsky , the Court deemed it incontrovertible that the language at issue-"damn racketeer" and "damn Fascist"-would tend to incite a breach of the peace. 315 U.S. at 574, 62 S.Ct. 766. We have no difficulty concluding that those terms would qualify for First Amendment protection in 2016.
¶ 28 The word "cocksucker" is not an innocuous expression; it is vulgar and profane. But uttering the word is not a crime unless its mere utterance would tend to provoke a reasonable person to immediately retaliate with violence. The People point us to three cases, the most recent of which is nearly twenty-five years old, in which courts upheld disorderly conduct convictions where one of the words spoken was "cocksucker." See City of Little Falls v. Witucki , 295 N.W.2d 243 (Minn. 1980) ; State v. Broadstone , 233 Neb. 595, 447 N.W.2d 30 (1989) ;
*1112 City of Shaker Heights v. Marcus , No. 61801, 1993 WL 27676 (Ohio Ct. App. 1993). But in each of those cases, the words (which included more than "cocksucker") were accompanied by violent or threatening gestures. In Marcus , for example, the defendant was described as "extremely agitated, loud, [and] combative." 1993 WL 27676, at *1. Witnesses thought he might "use force against" the bank manager. Id. In Broadstone , the defendant not only cursed at the witness, but also assaulted him with a stick. 447 N.W.2d at 32-33. And in Witucki , the court characterized the defendant's speech as threatening because it scared the victim who was working alone in a bar. 295 N.W.2d at 244.
¶ 29 Later cases from these jurisdictions make clear that the decisions turned on the totality of the circumstances, particularly the threatening nature of the defendant's speech and conduct. See City of Chillicothe v. Lowery , No. 97 CA 2331, 1998 WL 396316, at *5, *7 (Ohio Ct. App. 1998) (discussing disorderly conduct cases in Ohio, including Marcus , and concluding that "[i]n all of the cases upholding convictions for disorderly conduct involving profane language, the courts found that the profanity was used in a situation that likely could have become violent"); see also M.A.H. , 572 N.W.2d at 757 (citing Witucki and noting that "[e]very speech-related disorderly conduct conviction upheld by Minnesota appellate courts since [1978] has involved either an explicit verbal or physical threat of violence or a situation where the victims were placed in fear of imminent physical harm").
¶ 30 Thus, even if we otherwise found these cases persuasive, their facts are distinguishable from the circumstances presented in this case.
¶ 31 In any event, more recent cases suggest that "cocksucker" has lost its former incendiary quality.[4] See People v. Pierre-Louis , 34 Misc.3d 703, 927 N.Y.S.2d 592, 593 (N.Y. Dist. Ct. 2011) (holding that defendant's tirade against district attorney, in which he stated that district attorney was a "piece of shit faggot fucking cock sucking cock," did not constitute fighting words); ARMCO, Inc. v. United Steelworkers of Am. , No. 2002CA0071, 2003 WL 22300027, at *7 (Ohio Ct. App. 2003) (holding that the insult "Afro cock sucker" was "mere words" and would not tend to incite immediate violence); see also State v. Swoboda , 658 S.W.2d 24, 25, 27 (Mo. 1983) (though unpleasant, the words used by defendant-"motherfucker" and "cocksucker"-are "by no means uncommon" and constitute "everyday street language") (citation omitted); State v. McKenna , 415 A.2d 729, 732 (R.I. 1980) ("[A] group of people with normal sensibilities would not likely retaliate against a woman who called them [cocksuckers] and made wild, idle threats.").
¶ 32 In light of the surrounding circumstances, we conclude that the crude, sophomoric Snapchat photo does not rise to the level of "fighting words." A middle school student of average sensibilities and maturity might have told R.C. that the photo was not funny, as L.P.'s friends did, or reported the hurtful conduct to a school administrator, as L.P. and his friends did later that day. But the average person-even an average fourteen-year-old-would not be expected to fly into a violent rage upon being shown a photo of himself with a penis drawn over it. R.C.'s display simply does not fall within the "exceedingly narrow" class of insults for which violence is a reasonably expected response.
¶ 33 Our decision does not leave the school without a remedy for inappropriate student behavior. A school administrator may, consistent with the First Amendment, discipline a student for broadcasting vulgar and offensive speech. See Bethel Sch. Dist. No.403 v. Fraser , 478 U.S. 675, 685, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (students' First Amendment rights are circumscribed in light of special characteristics of the school environment). And Colorado, like most states, has an anti-bullying statute that gives *1113 schools the specific authority to prescribe consequences for conduct that satisfies the definition of bullying. See § 22-32-109.1, C.R.S. 2016.
¶ 34 In sum, we agree with R.C. that his display of the altered photo did not amount to fighting words. Accordingly, the government failed to prove an element of the offense.
¶ 35 In light of our resolution of the first question, we need not reach the second question-whether the evidence was sufficient to prove that R.C. knew, or recklessly disregarded a substantial risk, that his display would result in an immediate breach of the peace.
III. Conclusion
¶ 36 The judgment of conviction is reversed.
JUDGE ASHBY concurs.
JUDGE WEBB dissents.

Snapchat is a popular mobile application that allows cell phone users to send photos and videos to their friends or contacts. Once the photo or video is sent to another person and viewed, it automatically deletes within a few seconds. However, the user can save a photo for up to twenty-four hours using the "Snapchat story" feature.
The app has another feature that allows the cell phone user to use a finger to draw or write over the photo with what looks like a marker or a crayon. Figure 1 shows the Snapchat drawing app on a cell phone; Figure 2 is an example of a finished product.
?
See Appamatix, 3 Best Snapchat Secrets of 2014 , October 12, 2014, available at http://appamatix.com/3-best-snapchat-secrets-2014/; Daily Mail, Now You Can Make Your Own Snapchat Lenses , July 21, 2016, available at http://www.dailymail.co.uk/sciencetech/ article3701038/Now-make-Snapchat-lenses-Fun-Face-Paint-feature-letsdraw-selfies.html.

R.C. also contends, for the first time on appeal, that the disorderly conduct statute requires proof of an actual breach of the peace, rather than proof that the display tended to incite a breach of the peace, and that the prosecution failed to prove that element as well. We need not decide the standard of review to apply in the event of an error because we perceive no error. The statute requires that the obviously offensive display "tend[ ] to incite an immediate breach of the peace." People in Interest of K.W. , 2012 COA 151, ¶ 29, 317 P.3d 1237 (quoting § 18-9-106(1)(a), C.R.S. 2016 ). Whether a breach of the peace actually occurs "is not determinative of a violation." Id. at ¶ 32.

Protected speech is not transformed into "fighting words" by the peculiar sensibilities of the listener. Zamecnik v. Indian Prairie Sch. Dist. No. 204 , 636 F.3d 874, 879 (7th Cir. 2011) ("Statements that while not fighting words are met by violence or threats or other unprivileged retaliatory conduct by persons offended by them cannot lawfully be suppressed because of that conduct."); see also Street v. New York , 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (speech cannot be restricted simply because some listeners, "shocked" by the defendant's disrespectful conduct of burning a flag, might be "moved to retaliate" against him). If First Amendment rights are subject to a middle schooler's "heckler's veto," the level of discourse might be limited "to that which would be suitable for a sandbox." Reno v. Am. Civil Liberties Union , 521 U.S. 844, 875, 880, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (quoting Bolger v. Youngs Drug Prods. Corp. , 463 U.S. 60, 74-75, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ). But even taking L.P.'s age into consideration, we do not believe violence would have been a reasonable response to R.C.'s display of the photo.

The word also appears to have entered our coarsened political discourse. In August 2016, the Governor of Maine, Paul LePage, left a profanity-laden voicemail for a state legislator in which he called the legislator a "little son of a bitch, socialist cocksucker" and lamented that he could not challenge the legislator to a duel. Eric Russell & Scott Thistle, LePage Effectively Endorses Racial Profiling in Maine's Battle Against Drug Addiction , Portland Press Herald, Aug. 26, 2016, https://perma.cc/5A6F-JMUF. We are reluctant to hold a middle school student to a higher standard than the Governor of Maine.