# Supreme Court of Texas

No. 21-0978

The Lilith Fund for Reproductive Equity,

*Petitioner*,

v.

Mark Lee Dickson and Right to Life East Texas,

*Respondents*

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

*~ consolidated for oral argument with ~*

No. 21-1039

Mark Lee Dickson and Right to Life East Texas,

*Petitioners*,

v.

The Afiya Center and Texas Equal Access Fund,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued October 26, 2022**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE DEVINE filed a concurring opinion, in which Justice Blacklock joined.

In these companion cases, advocacy groups supporting legalized abortion have sued an opponent of it, claiming that he legally defamed them by making statements that equate abortion to murder and by characterizing those who provide or assist in providing abortion, including the plaintiffs, as "criminal" based on that conduct. The speaker responded that his statements represent his opinion about that conduct as part of his advocacy for changes in the law and its interpretation.

Two courts of appeals considered whether the speaker's statements could be defamatory and reached opposite conclusions. One court of appeals placed the statements in the context of the ongoing moral, political, and legal debate about abortion. It concluded that the statements are political opinions that voice disagreement with the legal protections afforded to abortion providers. That court of appeals ordered the suit dismissed.

The other court of appeals examined whether a court could legally verify the speaker's statements—in other words, it asked whether abortion met the legal definition of murder under the Texas Penal Code at the time. Concluding that the speaker's statements were inconsistent with the Penal Code, that court of appeals permitted the defamation suit to continue.

We granted review to resolve the conflict between the two courts. We hold that the challenged statements are protected opinion about

2

abortion law made in pursuit of changing that law, placing them at the heart of protected speech under the United States and Texas Constitutions. Such opinions are constitutionally protected even when the speaker applies them to specific advocacy groups that support abortion rights. In our state and nation, an advocate is free "to speak, write or publish his opinions on any subject,"[1] perhaps most especially on controversial subjects like legalized abortion.

An examination of the statements and their context shows no abuse of the constitutional right to freely speak. The speaker did not urge or threaten violence, nor did he misrepresent the underlying conduct in expressing his opinions about it. Either potentially could have removed his constitutional protections.

The Texas Citizens Participation Act provides for early dismissal of lawsuits that chill a citizen's exercise of free speech unless the lawsuit has merit. Because the speaker in this case properly invoked the Act and the plaintiffs failed to adduce evidence of defamation in response, these cases must be dismissed. Accordingly, we affirm the judgment of the court of appeals that dismissed the defamation suit before it, and we reverse the judgment of the court of appeals that permitted the companion suit to advance.

**I**

**A**

The events giving rise to these two lawsuits occurred in the years preceding the United States Supreme Court's decision in *Dobbs v.*

---

[1] Tex. Const. art. I, § 8.

*Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). During that time, many groups and individuals vigorously sought to uphold and expand access to legal abortion. Others just as vigorously sought to criminalize abortion, advocating that the United States Supreme Court's decisions in *Roe v. Wade*, 410 U.S. 113 (1973)*, and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which afforded constitutional protections to some abortions, should be overturned. In the wake of *Dobbs*, their advocacy positions with respect to the law as it stands in Texas are now reversed.

The Lilith Fund for Reproductive Equity, the Afiya Center, and Texas Equal Access Fund—the plaintiffs in these cases—publicly advocate for legalized abortion. Mark Lee Dickson and Right to Life East Texas—the defendants in these cases—publicly advocate against legalized abortion.

The dispute between these opposing sides to the debate centers on Dickson's activities in East Texas. In June 2019, Dickson successfully lobbied the city council in Waskom, Texas, to pass an ordinance declaring the town to be a "Sanctuary City for the Unborn."

The 2019 Waskom Ordinance states that abortion is "an act of murder with malice aforethought," and it conditionally criminalizes aiding or abetting most abortions should the United States Supreme Court overrule *Roe v. Wade*. The Ordinance initially listed the plaintiffs in these suits, among others, as "criminal organizations" that "perform abortions and assist others in obtaining abortions."[2] Though the

---

[2] A year later, Waskom repealed and replaced the Ordinance with a version that omits the identification of any "criminal organizations."

4

Ordinance is the genesis of this controversy, the plaintiffs have not sued the City of Waskom, nor do they seek to set aside the Waskom Ordinance based on a legal or constitutional challenge. Instead, the plaintiffs challenge Dickson's speech in the wake of the Ordinance's passage.

Shortly after the City passed the original Ordinance, Dickson posted statements about it to his Facebook page and to the Right to Life East Texas Facebook page. In his posts, he encouraged others to join his campaign to bring similar ordinances to other Texas cities. In one post, he asks readers to sign a petition favoring such ordinances. In another, he quotes the Ordinance and identifies the plaintiffs in this case as "criminal organizations." In other posts, Dickson writes that the plaintiffs "exist to help pregnant Mothers murder their babies" and "murder innocent unborn children." Dickson appended hashtag links to attract views from like-minded readers and to direct them to other messages opposing abortion.

Readers responded in the comments section of Dickson's posts with statements of their own. Some comments supported Dickson's views and others opposed them, with both sides at times employing fiery language. The plaintiffs also responded with billboards near Waskom that presented their opposing message, that "abortion is freedom."

CNN reported on the controversy, quoting Dickson as saying: "The idea is this: in a city that has outlawed abortion, in those cities if an abortion happens, then later on when Roe v. Wade is overturned, those penalties can come crashing down on their heads."

In June 2020, the plaintiffs wrote Dickson and Right to Life East Texas, requesting that Dickson retract his statements labeling plaintiffs

5

as "criminal organizations." The plaintiffs asked Dickson to "specifically clarify that neither you, nor to your knowledge anyone else, has any evidence or reason to believe that any of the organizations named above nor any of their agents has committed any acts in violation of the criminal laws of the United States or of any state or local government." Dickson did not reply.

**B**

One week later, the Afiya Center sued Dickson and Right to Life East Texas in Dallas County. The same day, the Lilith Fund filed a nearly identical suit against Dickson and Right to Life East Texas in Travis County. In both suits, the plaintiffs allege that Dickson's statements are legally defamatory because they connect the plaintiffs with "literal, criminal murder." The plaintiffs further allege that Right to Life East Texas engaged in a "conspiracy to commit defamation" by permitting Dickson to post his statements on its Facebook page.

Dickson and Right to Life East Texas moved to dismiss both suits under the Texas Citizens Participation Act.[3] Under the Act, a court "shall dismiss" a legal action based on the defendant's exercise of the right to free speech, unless "clear and specific evidence" establishes "a prima facie case for each essential element of the claim in question."[4] Among other arguments, Dickson contended that he made no false statements of fact because (1) it is not defamatory to quote or report on a city ordinance; (2) his characterization of abortion as murder is a true

---

[3] Tex. Civ. Prac. & Rem. Code §§ 27.001–.011.

[4] *Id.* § 27.005.

statement; and (3) it is not defamatory to characterize the plaintiffs as criminal organizations in this context because his use of "murder" is "obviously not intended to be taken in its literal sense, but rather as an expression of [his] view that abortion is tantamount to murder."[5] Dickson further argued that the plaintiffs are limited-purpose public figures who did not establish that he acted with actual malice, which requires knowledge of, or reckless disregard for, the falsity of the statement.[6]

The plaintiffs responded that Dickson falsely characterized abortion as murder when it was no such thing under Texas law, and to call them "criminal organizations" based on this characterization when some abortions were legal in Texas is defamatory.

The Travis County district court did not rule on Dickson's motion to dismiss, and it was denied by operation of law.[7] The Seventh Court of Appeals reversed.[8] The court of appeals concluded that "a reasonable person of ordinary learning would deem [the] accusation about Lilith being a criminal entity engaged in criminal acts as opinion," which the speaker made in seeking "a change in law."[9] The context surrounding Dickson's comments is "an indisputable part of the entire canvas upon which he left his words," and that context, the court concluded, informed

---

[5] *See* 1 Rodney A. Smolla, Law of Defamation § 4:13 (2d ed. 2005).

[6] *See Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016).

[7] *See* Tex. Civ. Prac. & Rem. Code § 27.008(a).

[8] 647 S.W.3d 410, 419 (Tex. App.—Amarillo 2021).

[9] *Id.* at 417.

7

a reasonable person that Dickson's statements were not intended to be taken literally.[10]

In the other lawsuit, the Dallas County district court denied Dickson's motion, and the Fifth Court of Appeals affirmed.[11] The court of appeals undertook to determine whether the statement "abortion is murder" was objectively false, and it sought to verify whether abortion fell within the definition of murder in the Texas Penal Code. The court observed that the United States Supreme Court had declared Texas laws criminalizing abortion to be unconstitutional.[12] It also recited an "unambiguous" concurring opinion from the Court of Criminal Appeals that "[a] mother choosing to abort her unborn child is not a crime under Texas law."[13] The court of appeals thus concluded that the Afiya Center had made a prima facie case for defamation because "they have not committed a crime generally, or murder specifically, while engaging in any conduct condemned by [Dickson]."[14]

A justice dissenting from the court of appeals' denial of en banc review criticized the panel's failure to consider the overall context of Dickson's statements, which he viewed as plainly demonstrating a moral and social context to Dickson's characterizations that reflected his

---

[10] *Id.* at 418.

[11] 636 S.W.3d 247 (Tex. App.—Dallas 2021).

[12] *Id.* at 259.

[13] *Id.* (quoting *State v. Hunter*, 624 S.W.3d 589, 589 (Tex. Crim. App. 2021) (Keller, P.J., concurring in denial of review)).

[14] *Id.* at 260.

disagreement with the Supreme Court's decision in *Roe v. Wade*.[15] The dissenting justice observed that "the plaintiffs' claims in this case seek to suppress and punish speech any reasonable observer would see as a criticism of past judicial decision-making."[16]

We granted the parties' competing petitions for review from the directly conflicting appellate court judgments.

## II

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."[17] These words have been with us in some form since the Republic's Constitution.[18] Each generation's struggles and fears, however, test our society's commitment to the principle. From the inception of the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech,"[19] it has been the task of the courts—and all of government—to reaffirm that society must bear the speech of everyone, including speech that others find intolerable or

---

[15] 650 S.W.3d 513, 513–14 (Tex. App.—Dallas 2021) (Schenck, J., dissenting from denial of en banc review).

[16] *Id.* at 513.

[17] Tex. Const. art. I, § 8.

[18] Repub. Tex. Const. of 1836, Declaration of Rights, cl. 4 ("Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege. No law shall ever be passed to curtail the liberty of speech or of the press; and in all prosecutions for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and fact, under the direction of the court.").

[19] U.S. Const. amend. I.

offensive. In upholding the right to freely speak and protest, courts have vindicated all sorts of speakers, including abolitionists, antiwar protesters, civil rights groups, religious minorities, unionizers, communists, and even groups advocating racial hatred or fascism.[20]

Wading against currents of public opinion, courts have protected unpopular and even reprehensible speech. The United States Supreme Court held a Texas law prohibiting desecration of the flag unconstitutional despite public sentiment that seemed to overwhelmingly favor criminalizing flag burning.[21] The Court also

---

[20] *See* David Martin, Trial of the Rev. Jacob Gruber 21–22 (1819), https://www.loc.gov/resource/rbcmisc.lst0094/ (describing the trial and ultimate acquittal by a jury of a Maryland pastor indicted for inciting "acts of mutiny and rebellion" after his delivery of antislavery sermons (emphasis omitted)); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) (affirming students' rights to protest the Vietnam War at school); *Cox v. Louisiana*, 379 U.S. 536, 558 (1965) (reversing convictions of civil rights protesters); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (holding unconstitutional an ordinance that banned Jehovah's Witnesses from gathering in a public park but permitted other Christian services); *Ex parte Tucker*, 220 S.W. 75, 75–76 (Tex. 1920) (vacating an injunction restraining union members from "vilifying, abusing, or using opprobrious epithets to or concerning any party or parties in the employment of plaintiff"); *Herndon v. Lowry*, 301 U.S. 242, 263–64 (1937) (granting habeas relief to a member of the Communist Party of Atlanta convicted of inciting insurrection for possessing communist literature); *Village of Skokie v. Nat'l Socialist Party of Am.*, 373 N.E.2d 21, 26 (Ill. 1978) (striking an injunction barring the display of a swastika).

[21] *Texas v. Johnson*, 491 U.S. 397, 420 (1989); *see id.* at 426 (Rehnquist, C.J., dissenting) (discussing public sentiment against flag burning); *see also* Patricia Lofton, Note, *Texas v. Johnson: The Constitutional Protection of Flag Desecration*, 17 Pepp. L. Rev. 757, 783–84 (1990) (summarizing popular and political responses to the *Johnson* decision, including a 97–3 vote in the U.S. Senate registering "profound disappointment" and a national poll revealing that 71% of Americans supported an amendment to the Constitution to ban flag burning).

granted First Amendment protection to a public protest at a soldier's funeral and burial,[22] and to grotesque depictions of animal cruelty.[23]

Our Court similarly has protected speech targeting others. We have vacated injunctions restraining unionizers who harassed employees and restraining a dissatisfied customer from accusing a car dealer of violating the lemon laws.[24] In granting habeas relief to a news dealer arrested for distributing a newspaper banned as a "nuisance publication," the Court of Criminal Appeals observed that speech of all sorts—"political, secular, religious, decent or indecent, obscene or otherwise"—is constitutionally protected.[25]

Perhaps no speech more deserves and requires protection from governmental censure than that critical of the government and its decisions. Such protection demonstrates our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[26]

---

[22] *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (concluding that the protest was a matter of public concern).

[23] *United States v. Stevens*, 559 U.S. 460, 482 (2010) (holding a federal statute criminalizing depictions of animal cruelty unconstitutionally overbroad).

[24] *Tucker*, 220 S.W. at 75–76; *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 254–55 (Tex. 1983) (per curiam) (vacating an injunction restraining a customer from driving a car painted with words accusing a dealership of selling a "lemon" vehicle).

[25] *Ex parte Neill*, 22 S.W. 923, 924 (Tex. Crim. App. 1893) (granting habeas relief to a news dealer selling a newspaper banned by the city of Seguin).

[26] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Open debate is not without its limits. Constitutional protections give way in the face of certain classes of speech. Statements in which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" may, for example, constitute "true threats" afforded no constitutional protection.[27] Similarly, statements "directed to inciting or producing imminent lawless action" may be proscribed without offending the speaker's constitutional rights.[28]

Defamatory statements are a further category of speech that can fall outside the free speech constitutional guarantee. "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues."[29] States thus "retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual."[30] And the Texas Constitution expressly permits the law to hold a speaker "responsible for the abuse" of the "liberty to speak, write or publish his opinions on any subject."[31]

Any limitation that defamation law places on free speech, however, may not muzzle a speaker from asserting an opinion in an

---

[27] *Virginia v. Black*, 538 U.S. 343, 359 (2003).

[28] *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

[29] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *Sullivan*, 376 U.S. at 270).

[30] *Id.* at 345–46.

[31] Tex. Const. art. I, § 8.

ongoing debate about the law. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."[32]

### III

The Texas Citizens Participation Act protects speech on matters of public concern by authorizing courts to conduct an early and expedited review of the legal merit of claims that seek to stifle speech through the imposition of civil liability and damages.[33] To invoke the Act, a defendant must timely move to dismiss a claim and demonstrate that it "is based on or is in response to" the defendant's "exercise of the right of free speech, right to petition, or right of association."[34] The Act defines the exercise of free speech as "a communication made in connection with a matter of public concern."[35]

---

[32] *Gertz,* 418 U.S. at 339–40 (distinguishing between ideas and false statements of fact), *quoted in Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989).

[33] *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015). The Act describes its purpose as balancing constitutional rights with the rights of people to recover for legitimate injuries under the law:

> The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

Tex. Civ. Prac. & Rem. Code § 27.002.

[34] *Id.* § 27.003.

[35] *Id.* § 27.001(3).

After a defendant demonstrates that a claim falls within the Act's ambit, the plaintiff must establish it has "clear and specific evidence" to support "each essential element" of that claim.[36] In this case, the parties agree that the plaintiffs' claims are based on Dickson's exercise of his free speech rights and that the Act thus applies. With that understanding, we turn to whether the plaintiffs have adduced a prima facie case for their defamation claims.

## A

To prevail on a claim of defamation, a plaintiff must prove "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases."[37] This case turns on the first element. We examine whether Dickson's statements in the context they were made are constitutionally protected opinions about the government's enactment and interpretation of its laws, or instead are false statements of fact. Whether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law.[38]

We answer this legal question from the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements.[39] Both the United States and Texas Constitutions protect "'statements that cannot reasonably be

[36] *Id.* § 27.005(c).

[37] *Lipsky*, 460 S.W.3d at 593.

[38] *Dall. Morning News v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018).

[39] *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002).

14

interpreted as stating actual facts about an individual' made in debate over public matters."[40]

Accordingly, statements that are verifiably false are not legally defamatory if the context of those statements discloses that they reflect an opinion.[41] A reasonable person reads communications in their entirety and is aware of relevant contemporary events.[42] In furtherance of this principle, our Court has held that a judge and district attorney had no defamation claim based on a satirical article attributing to them fictitious statements and actions.[43] We rejected the imposition of civil liability in that case because an objectively reasonable reader would not form "an opinion about the article's veracity after reading a sentence or two out of context."[44] We also rejected the effort to use subjective interpretations of belief based on isolated statements as evidence of defamation.[45]

Similarly, in a defamation case in which the plaintiff parents alleged that a newspaper editorial defamed them by telling readers that the parents were deceptive in concealing aspects of a family tragedy, we

---

[40] *Id.* at 580 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

[41] *Tatum*, 554 S.W.3d at 624.

[42] *See id.* at 639; *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 160 (Tex. 2004).

[43] *New Times*, 146 S.W.3d at 147.

[44] *Id.* at 159.

[45] *Id.* at 158–59.

rejected the notion that such an implication was defamation.[46] The editorial's suggestion of deception was not actionable, we held, because the "column's context manifestly discloses that any implied accusation of deception . . . is opinion."[47]

In considering the entire communication, a reasonable person is also cognizant of the speaker's method and style of dissemination.[48] "It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service."[49] Courts should consider whether the overall language conveys a personal viewpoint about the facts. Thus, our Court rejected the parents' defamation claim against a newspaper based on its editorial because "[t]he column as a whole, though it includes facts, argues in support of the opinion that the title conveys."[50]

## B

Before encountering Dickson's statements, a reasonable reader is acquainted with the history of society's debate about abortion.[51] In this country, a reasonable reader could not be ignorant of the ongoing, highly

---

[46] *Tatum*, 554 S.W.3d at 639.

[47] *Id.*

[48] *See Bentley*, 94 S.W.3d at 583.

[49] *Id.* (quoting *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) (en banc)).

[50] *Tatum*, 554 S.W.3d at 639.

[51] *See New Times*, 146 S.W.3d at 160 (noting that a reasonable person would be aware of the contemporary event that the satirical article referenced).

publicized, and fervent debate over many decades regarding the morality and legality of abortion. The public was actively shaping the laws surrounding abortion even before the United States Supreme Court declared some abortions to be constitutionally protected in *Roe v. Wade*.[52] When the Supreme Court revisited abortion in an attempt to settle its constitutionality in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, a plurality of the Court wrote that "[m]en and women of good conscience can always disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage."[53] Nonetheless, the plurality asked "the contending sides of a national controversy to end their national division by accepting a common mandate" based on the plurality's assessment of constitutional law.[54] As the Court observed in last year's *Dobbs* decision removing constitutional protections for abortion, however, "*Casey* did not achieve that goal" of unifying Americans on the topic.[55] "Americans continue to hold passionate and widely divergent views on abortion, and state legislatures have acted accordingly."[56]

In between these Supreme Court cases, the courts have entertained regular contests over parental-notification laws, federal

---

[52] *See Roe*, 410 U.S. at 139–40 (discussing efforts beginning in the late 1960s to liberalize abortion laws in many states).

[53] 505 U.S. at 850.

[54] *Id.* at 867.

[55] *Dobbs*, 142 S. Ct. at 2242.

[56] *Id.*

funding for abortions, partial-birth abortions, informed-consent requirements, regulatory requirements for abortion clinics, and private civil enforcement.[57] The two major political parties have made statements on abortion part of their party platforms nearly every year since *Roe v. Wade*.[58] In short, the debate over abortion is a fixture of our political landscape.

---

[57] *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 651 (1979) (holding unconstitutional a Massachusetts statute requiring a minor seeking an abortion to notify her parents); *Harris v. McRae*, 448 U.S. 297, 326 (1980) (concluding that the Hyde Amendment, which denied public funding for certain abortions, was not unconstitutional); *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (upholding a federal statute restricting partial-birth abortions); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 572 (5th Cir. 2012) (vacating an injunction suspending Texas laws requiring physicians to display sonogram images of the fetus to the mother and make the fetus's heartbeat audible before performing an abortion); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2318 (2016) (holding unconstitutional a Texas statute requiring abortion providers to be licensed equivalently as ambulatory surgical centers and have admitting privileges at a hospital within 30 miles); *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 539 (2021) (rejecting a pre-enforcement challenge to a Texas law providing for civil enforcement of abortion ban).

[58] For example, compare the 1980 Democratic Party Platform ("The Democratic Party supports the 1973 Supreme Court decision on abortion rights as the law of the land and opposes any constitutional amendment to restrict or overturn that decision.") with the 1980 Republican Party Platform ("While we recognize differing views on [abortion] among Americans in general—and in our own Party—we affirm our support of a constitutional amendment to restore protection of the right to life for unborn children."), and the 2020 Democratic Party Platform ("We believe unequivocally, like the majority of Americans, that every woman should be able to access high-quality reproductive health care services, including safe and legal abortion.") with the 2020 Republican Party Platform (adopting the 2016 party platform, which stated: "We support a human life amendment to the Constitution and legislation to make clear that the Fourteenth Amendment's protections apply to children before birth."). *See National Political Party Platforms*, The

A reasonable person is further aware that the primary argument espoused against legalized abortion is that abortion is an unjust killing of human life—that it is, in essence, murder.[59] Equally apparent is that such statements reflect an opinion about morality, society, and the law.[60]

Opinions that an unjust killing is tantamount to murder are not limited to the abortion debate. Opposition to war is often expressed as an objection to murder.[61] Opponents of capital punishment characterize

American Presidency Project, https://www.presidency.ucsb.edu/documents/presidential-documents-archive-guidebook/party-platforms-and-nominating-conventions-3.

[59] *Dobbs*, 142 S. Ct. at 2240 ("Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life."). The argument that abortion is murder predates *Roe v. Wade* by at least a century. *E.g.*, Horatio R. Storer, *Contributions to Obstetric Jurisprudence*, 3 N. Am. Medico-Chirurgical Rev. 64, 64 (1859), https://archive.org/details/northamericanmed31859phil/page/64/mode/2up ("By the Common Law and by many of our State Codes, fœtal life, per se, is almost wholly ignored and its destruction unpunished; abortion in every case being considered an offence mainly against the mother, and as such, unless fatal to her, a mere misdemeanor, or wholly disregarded. By the Moral Law, the wilful killing of a human being at any stage of its existence is Murder." (emphasis omitted)).

[60] *See Van Duyn v. Smith*, 527 N.E.2d 1005, 1007, 1014 (Ill. App. Ct. 1988) (rejecting abortion provider's defamation suit against a protester who distributed a "Wanted" poster based on the provider's participation in "prenatal killings" as not a verifiable defamatory statement of fact, given the context).

[61] Actor Sean Penn attracted notoriety for accusing a presidential administration of "deceiving the American people into a situation that is murdering young men and women from this country and others" and calling for the president and his cabinet to be imprisoned. *Real Time with Bill Maher* (HBO television broadcast May 4, 2007), *quoted in* Robert Bejesky, *Support the Troops: Renewing Angst over* Massachusetts v. Laird *and Endowing Service Members with Effectual First and Fifth Amendment Rights*,

it as "state-sanctioned murder."[62] Vegetarian advocates chant that "meat is murder."[63] The animal-rights advocacy group People for the Ethical Treatment of Animals equates wearing fur clothing to murder.[64] This historical background of debate on controversial subjects, including abortion, provides important context to a reasonable reader of the statements challenged in this case.

An ordinary reader gleans additional context by reading the full text of Dickson's Facebook statements and the responses to them.[65] As the statements themselves make clear, Dickson was engaged in a campaign to pass ordinances similar to the Waskom Ordinance in other towns. He used his Facebook page and that of Right to Life East Texas

---

78 Alb. L. Rev. 447, 470 (2015). Antiwar protesters Code Pink charge that drone strikes against Al-Shabaab militants in Somalia are "murder." Toby Blomé, *4th Annual Shut Down Creech: "Stop the Murder, Stop the War Crimes"*, CodePink (Oct. 25, 2018), https://www.codepink.org/_stop_the_murder_stop_the_war_crimes.

[62] *E.g.*, David S. Cohen, *State-Sanctioned Murder is Back, Thanks to SCOTUS*, Rolling Stone (July 14, 2020), https://www.rollingstone.com/culture/culture-news/supreme-court-death-penalty-state-sanctioned-murder-daniel-lewis-lee-1028702/ (objecting to the Supreme Court's refusal to intervene in a federal execution).

[63] *E.g.*, Mitchell Byars, *Protesters Chanting "Meat is Murder" Ruin $1,000 Worth of Food at Boulder's Ideal Market, Police Say*, The Denver Post (Feb. 27, 2017), https://www.denverpost.com/2017/02/27/boulder-ideal-market-meat-is-murder/; The Smiths, Meat is Murder (Rough Trade Records 1985).

[64] *E.g.*, PETA (@peta), Twitter (Nov. 29, 2017, 9:55 AM), https://twitter.com/peta/status/935899555092512768 ("Fur is murder! PETA joined hundreds of protesters on #FurFreeFriday in #BeverlyHills to speak up for animals killed for fur.").

[65] *See New Times*, 146 S.W.3d at 159 (noting that a reasonable reader does not form a perception of a piece based on snippets considered out of context).

to inform, persuade, and encourage his supporters. His activities attracted counter-lobbying efforts from groups that support legalized abortion.

The challenged statements were a part of this campaign. Some recite the Waskom Ordinance or reference its effect. Several posts include links to petitions and advocacy hashtags. Other posts engage with the plaintiffs' and others' responsive speech favoring legalized abortion. As the responding comments show, the collective impression is not that Dickson was disseminating facts about particular conduct, but rather advocacy and opinion responding to that conduct.[66] Dickson invited the reasonable reader to take political action.

The tone and language Dickson employs is exhortatory, not factual: "If you want to see your city pass an enforceable ordinance outlawing abortion be sure to sign the online petition"; "Stand strong leaders of Big Spring. You are going to be on the right side of history"; "[W]e need to be battling these battles on the home front of our cities." Like the first-person editorial characterizing the parents' description of a family tragedy as deceptive, the language used clues the reader that Dickson's purpose is advocacy, not the dissemination of facts.[67]

Further, a statement must concern the plaintiff to be defamatory.[68] Dickson's opinions about the effectiveness of the

---

[66] *See Bentley*, 94 S.W.3d at 583 (observing that the reasonable reader is sensitive to the method of dissemination).

[67] *See Tatum*, 554 S.W.3d at 639 (assessing the "first-person, informal style" of the communication under review).

[68] *Id.* at 623.

Ordinance or United States Supreme Court decisions, or about abortion generally, right or wrong, are not about the plaintiffs. They do, however, inform the context of the statements that specifically refer to the plaintiffs.[69]

In those specific statements, Dickson describes the plaintiffs as "criminal organizations" in connection with the Waskom Ordinance and based on the plaintiffs' support of legalized abortion. In one statement, Dickson quotes the Ordinance, then paraphrases that "[a]ll organizations that perform abortions and assist others in obtaining abortions (including . . . The Afiya Center, The Lilith Fund for Reproductive Equality [sic] . . . Texas Equal Access Fund, and others like them) are now declared to be criminal organizations in Waskom, Texas." The plaintiffs do not contend that Dickson misrepresented the contents of the Ordinance. Rather, the Lilith Fund argues that the Ordinance "was part of the defamation, not merely context for it" because Dickson assisted in drafting the Ordinance and lobbied for its passage.

The Lilith Fund cites no authority in support of its argument that a speaker who republishes the contents of a city ordinance may be held liable for defamation based on the content of the ordinance. To the extent that Dickson could be liable, however, we observe that his recitation of the Ordinance was made in the same context as his other statements, as part of his overall campaign to advocate for changes to

---

[69] *See id.* at 624 (requiring statements to be considered in context).

22

abortion laws. His statements about the Ordinance are no different in context than the other challenged statements.

In another statement, Dickson describes the effect of the Ordinance as "treat[ing] groups like . . . the Lilith Fund as criminal organizations." Dickson's prediction as to the Ordinance's legal effect—however forcefully couched—was pure opinion. Whether the Ordinance constitutionally or effectively criminalizes particular actions is not before the Court. Whether Dickson is right or wrong about the Ordinance's effectiveness, the statement is not a false statement about the plaintiffs' conduct.

In another post responding to the "abortion is freedom" billboards, Dickson also identifies one of the plaintiffs as listed as a criminal organization in Waskom:

> The Lilith Fund and NARAL Pro-Choice Texas are advocates for abortion, and since abortion is the murder of innocent life, this makes these organizations advocates for the murder of those innocent lives. This is why the Lilith Fund and NARAL Pro-Choice Texas are listed as criminal organizations in Waskom, Texas. They exist to help pregnant Mothers murder their babies.

A reasonable person, equipped with the national, historical, and temporal context, and informed by the overall exhortative nature of his posts, could not understand Dickson as conveying false information about the plaintiffs' underlying conduct, as opposed to his opinion about the legality and morality of that conduct. A reasonable person would understand that Dickson is advancing longstanding arguments against legalized abortion, in the context of an ongoing campaign to criminalize abortion, on public-discourse sites regularly used for such advocacy.

23

The plaintiffs argue that opinion based on a false assertion of fact can be actionable defamation. In other words, they argue that Dickson's advocacy declaring them to be "criminal" goes beyond mere opinion. The plaintiffs rely on *Bentley v. Bunton*, in which our Court concluded that a radio host's repeated insistence that he possessed evidence of a judge's corruption was not constitutionally protected.[70] The radio host claimed undisclosed (and nonexistent) court records, public records, and interviews with courthouse employees supported his accusation. Unlike the statements made by the radio host in *Bentley*, however, the plaintiffs in this case do not assert that Dickson falsely conveyed that they had engaged in particular conduct when they had not. Instead, Dickson conveyed his moral judgment of the plaintiffs' actions: that abortion is an unjust killing that ought to be criminalized and that plaintiffs are complicit in advancing such conduct.

Relying on Dickson's statements to CNN, the plaintiffs further respond that readers could be misled into believing that those who assist others in obtaining abortions in Waskom could be held criminally culpable. Dickson's statement to CNN does not identify the plaintiffs, however, and thus is not actionable as to them.[71] Moreover, the question

---

[70] 94 S.W.3d at 585–86.

[71] A statement need not identify a plaintiff by name. *See Tatum*, 554 S.W.3d at 622 (observing that the opinion column did not refer to the plaintiffs by name but contained enough details for a person familiar with the plaintiffs to identify them). However, the defamatory statements must "concern[]" the plaintiff. *E.g.*, *Lipsky*, 460 S.W.3d at 593. Dickson's statements to CNN refer only to unspecified entities or individuals who violate the Waskom Ordinance.

is not whether a statement may mislead any reader, but whether it would mislead a reasonable reader.[72]

Notable is what Dickson does not say in his statements. He does not refer to the Penal Code nor to any Texas criminal law. He does not falsely claim that the plaintiffs have been arrested or prosecuted, or otherwise indicate to the reasonable person that the plaintiffs have been convicted of crimes based on specific conduct. To the contrary, Dickson invokes a moral premise, calling for his readers to change existing law to match that moral premise. In one of his comments, Dickson compares *Roe v. Wade* to the Supreme Court's long-repudiated endorsement of slavery. Dickson's analogy demonstrates that abortion's criminalization is his goal, in contrast to then-existing Supreme Court precedent.

Finally, Dickson argues in this Court that abortion is literally murder and that the Waskom Ordinance is enforceable in the wake of *Dobbs*. The plaintiffs respond that we should take Dickson at his word and offer the Court's opinion as to the legal merit of his claims and thus, according to the plaintiffs, their truth.

We have no reason to doubt Dickson's sincere beliefs that abortion is an unjust killing and that the Waskom Ordinance should have the effect he claims. But the sincerity of one's belief does not transform an opinion into a fact. In *Bentley*, the radio host's "consistent position at trial that his accusations of corruption were true [was] a compelling indication that he himself regarded his statements as factual and not

---

[72] *New Times*, 146 S.W.3d at 157 ("Thus, the question is not whether some actual readers were [misled], as they inevitably will be, but whether the hypothetical reasonable reader could be." (footnote omitted)).

mere opinion."[73] We noted, however, that the host relied on nonexistent records of conduct that had never occurred to inform that belief, making the statements actionable based on the falsity of the underlying facts.[74] A subjective belief, even when sincerely held by a speaker, is not the standard for determining whether a statement of opinion is defamatory.[75] The touchstone is the reasonable reader's reception, not the speaker's self-serving statements of intent or interpretation.[76]

\* \* \*

The Texas Citizens Participation Act carries forward the state's commitment to the free exchange of ideas enshrined in our Texas and United States Constitutions. Aware of the chilling effect that defamation lawsuits have against individuals ill-equipped to finance protracted litigation, the Legislature has armed speakers with tools to seek quick dismissal of meritless suits brought to stop public debate.

---

[73] 94 S.W.3d at 584.

[74] *Id.* ("Bunton repeatedly insisted that evidence he had seen but had not disclosed supported his assertions. He had reviewed many public records, he said, and talked with courthouse employees. Much other information was publicly available, he continually assured viewers, to substantiate Bentley's corruption in office.").

[75] *See Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 854 (Tex. 2005) ("As we recently noted, the reasonable-reader standard is objective rather than subjective.").

[76] *E.g.*, *New Times*, 146 S.W.3d at 157–58 (stressing that the test is not whether some readers may be misled, but whether the hypothetical reasonable reader could be misled).

In dismissing these cases, we express no opinion on the opinions of others. Instead, we return both sides of the abortion debate to the battlefield of speech where it belongs. "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."[77]

Considering the context available to a reasonable reader, we hold that the plaintiffs failed to adduce specific evidence that Dickson's statements were defamatory.[78] We therefore affirm the judgment of the Seventh Court of Appeals. We reverse the judgment of the Fifth Court of Appeals, and we remand both causes to their respective trial courts for entry of a judgment of dismissal and further proceedings under the provisions of the Act.[79]

Jane N. Bland
Justice

**OPINION DELIVERED:** February 24, 2023

---

[77] *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

[78] Because the plaintiffs' conspiracy allegations against Right to Life East Texas depend on the merit of the claims against Dickson, a lack of "clear and specific evidence" of defamation requires the dismissal of the claims against both defendants. *See* Tex. Civ. Prac. & Rem. Code § 27.005(c).

[79] *See id.* § 27.009.